C.S., Petitioner,

v.

The PEOPLE of the State of Colorado, Respondent,

In the Interest of I.S., D.S. and N.A., children.

C.S., Petitioner,

v.

The PEOPLE of the State of Colorado, Respondent,

In the Interest of S.S., a child.

Nos. 03SC335, 03SC336.

Supreme Court of Colorado, En Banc.

Jan. 26, 2004.

Deborah Getz, Severance, Colorado, Attorneys for Petitioner.

Bruce T. Barker, Weld County Attorney, Jim L. Pope, Assistant Weld County Attorney, Attorneys for Respondent.

Justice KOURLIS delivered the Opinion of the Court.

## I. Introduction

These consolidated cases involve dependency and neglect, and, ultimately, termination proceedings with respect to a mother and her four children. The case began in 1999 with three of the children, and in 2000, the fourth and youngest child was added. On January 16, 2002, the magistrate entered orders terminating the mother's rights as to all four children, and allowing the parties five days to seek review of the orders with the district court, pursuant to section 19-1-108(5), 6 C.R.S. (2003). The mother failed to seek a review within this five-day period and instead appealed directly to the court of appeals. Not until July 17, 2002, did her counsel file a motion with the district court seeking leave to file a petition for review despite the expiration of time. On August 8, 2002, the court granted that motion and the mother filed her petition for review on August 29, 2002.

The district court then reviewed and affirmed the magistrate's orders. The mother filed a notice of appeal of the district court's decision with the court of appeals on November 21, 2002, within the forty-five days required by C.A.R. (4)(a). The court of appeals dismissed the appeal on the grounds that it lacked jurisdiction since the petition for review of the magistrate's order was not filed with the district court within five days of entry of the orders, as required by statute.

We granted certiorari on the question of whether a timely filing of a petition for review of a termination order entered in the first instance by a magistrate is a jurisdictional prerequisite to appeal. We conclude that it is not. Rather, we conclude that the district court had the discretion to entertain a late petition for review, and that once such late petition was accepted by the district court, the court of appeals had jurisdiction to review the appeal. Accordingly, we reverse the court of appeals' dismissal of the appeal.

Rather than remanding the case to the court of appeals to address the merits of the appeal, in the interests of judicial economy, we proceed to do so.

The mother, C.S., raises four issues on appeal. First, she alleges that the court erred in allowing her counsel to withdraw at the outset of the termination hearing and then erred in denying her motion to continue the hearing; second, she alleges that the court did not properly advise her of the consequences of going forward without an attorney; third, she alleges that her confession of the motion to terminate her rights as to the three older children was made without adequate advisement; and lastly, she alleges that the termination order as to the youngest child was not supported by clear and convincing evidence.

We now hold that the district court[1] did not abuse its discretion in allowing the mother's counsel to withdraw—at the re-

---

1. While it was, in fact, the magistrate who en- tered the orders of termination in this case, the

quest of the mother—just prior to the termination hearing and in then denying a motion to continue the proceeding such that the mother could seek yet a third attorney to represent her. Because a parent's right to counsel in a termination proceeding is a statutory right and not a constitutional one, it can be outweighed by considerations of finality, and, most importantly, the best interests of the children. We further hold that the mother's decision to confess the motion to terminate her parental rights as to her three older children was made with adequate advisement, throughout the course of the case, as to the consequences of such a decision. Lastly, we conclude that the district court's order terminating the mother's parental rights as to the fourth child was supported by clear and convincing evidence in the record. The Parent–Child Legal Relationship Termination Act of 1987 (the "Termination Act"), §§ 19–3–601 –703, 6 C.R.S. (2003), serves as the touchstone for evaluating the adequacy of the proceedings below. In that Act, our General Assembly balanced a parent's rights, family ties, and the child's welfare, and implemented various criteria and procedures that govern termination cases. Where the trial court substantially complies with the statute, there is a presumption of no prejudice to a parent in a termination hearing. *See People in Interest of A.M.D.*, 648 P.2d 625, 631 (Colo.1982). The record in this case reflects that the mandates of the Termination Act were satisfied, and that the district court did not abuse its discretion. Accordingly, we affirm all four termination orders and return this case to the district court for any further proceedings.

## II. Facts and Procedural History

Respondent Mother's (C.S.'s) three children, N.A., I.S., and D.S., then aged 10, 8, and 3, were removed from her home by the Weld County Department of Social Services (the "Department") on June 3, 1999. The Department then filed a petition with the Weld County District Court (the "district court") alleging that the children were dependent and neglected, pursuant to section 19–3–501, 6 C.R.S. (2003), on June 8, 1999. The matter was referred to a district court magistrate for handling. At this time, as well as at various other times during the course of this case, C.S. was served with an advisement of rights indicating that the proceedings could result in the termination of her parental rights. On July 1, 1999, the court entered a Deferred Adjudication, vested temporary custody of the children with the Department, entered protective orders concerning contact with the parents,[2] approved a treatment plan for C.S.'s rehabilitation as a parent, and ordered a formal investigation. The court also appointed Gladys Sexton as counsel for C.S. and appointed Troy Hause as guardian ad litem for the three children.

Various review hearings were held during the following year. In February of 2000, the court approved Permanency Plans recognizing that the children were not likely to return home within the next six months and approving continued placement with the Department. On March 22, 2000, C.S. gave birth to her fourth child, S.S. Because C.S. was complying with the treatment plan then in effect (she had found a place to live) the three older children were returned to C.S.'s home in June of 2000. On September 19, 2000, the three older children were once again removed, the youngest child was removed for the first time, and all four children

district court adopted the magistrate's findings and orders after reviewing the findings under a clearly erroneous standard pursuant to C.R.M. 7(a)(2). We find no error in the standard of review applied by the district court. Accordingly, for purposes of clarity, we make no distinction—except in reviewing our own jurisdiction in part III of this opinion—between the district court's order affirming the magistrate's termination orders and the termination orders as entered by the magistrate. Instead, we refer to the order throughout the opinion as the district court's or the court's termination orders. *See*

§ 19–1–104(1)(d), 6 C.R.S. (2003) *and* § 19–1–108(1), 6 C.R.S. (2003) (together giving exclusive jurisdiction to the district court to preside over termination hearings and enter termination orders and also permitting it to delegate its functions to district court magistrates).

2. The court ultimately terminated the legal parent-child relationship between all of C.S.'s children and their respective fathers. Those orders of termination are not contested and are, therefore, not addressed in this appeal.

were placed into the legal custody of the Department due to "homelessness, poor attendance in school and lack of parental supervision." The older children were placed temporarily with S.C., the children's maternal aunt.[3] The baby, S.S., was placed into a Weld County foster home. On the same day, the Department filed a petition for dependency and neglect concerning S.S., and the court entered temporary orders. Hause was appointed guardian ad litem for S.S. and Sexton was appointed as counsel for C.S. Again, C.S. received a written advisement explaining her rights concerning the dependency and neglect proceedings, and expressly warning her that her relationship with her children could be terminated such that they could be made eligible for adoption.

On November 17, 2000, the court approved a new treatment plan recommended by the Department, this one encompassing all four children. A hearing to review the Department's recommendations for permanent placement of the children (the "permanency hearing") was then set for February 8, 2001, a notice of which was sent to C.S. That notice included another advisement of the possibility of termination. The hearing was continued until April 19, 2001.

At the permanency hearing on April 19, 2001, the Department recommended termination of the parental relationship as to the three oldest children and stated that the goal concerning S.S. was for him to "return home." On May 8, 2001, the court decreed S.S. dependent and neglected and continued the matter until July 5, 2001, stating that the current treatment plan regarding S.S. would be ongoing. By July 5, the Department had determined to file a formal Motion to Terminate Parental Rights as to S.S. also. At that point, C.S. received another written advisement, this time specifically setting forth her rights and duties with respect to the pending termination petition. At a hearing that same day, C.S. requested that the court appoint new counsel for her and discharge Ms. Sex-

ton. She claimed that she needed a new appointed attorney because she had "been misguided, misrepresented," and because Sexton had failed to give the court some information that would have proved the "accusations against her were false." Sexton explained that because of C.S.'s distrust, the lawyer-client relationship had deteriorated. While the court did not find that Sexton had done anything improper, it reluctantly agreed to let Sexton withdraw, and appointed Jack Davis as C.S.'s attorney, telling C.S. at the time that "I will appoint one more attorney for you—[Davis]—and that is it." The court then continued the matter until July 26, 2001.

On July 26, 2001, the Department filed formal motions to terminate the parent-child relationship as to the three older children, and another written advisement was provided to C.S. The termination trial concerning all four children was then set for December 4 and 5, 2001, and the court ordered that custody of all four children would remain with the Department, with N.A. remaining at the placement home, D.S. and I.S. staying with their aunt, and S.S. remaining with his foster family. Mediation concerning the termination motion was ordered to occur by September 30, 2001, and a pre-trial hearing was set for November 17, 2001.

At the November 17 pre-trial hearing, Jack Davis moved to withdraw from his representation of C.S. As grounds for the motion, he cited his inability to prepare an adequate defense due to C.S.'s lack of cooperation and her failure to make scheduled meetings. The court denied the motion, but it advised C.S. to cooperate with her attorney and informed Davis that it would reconsider the motion at the December 4 hearing. Also at the November 17 hearing, C.S. indicated to the court that she would not be contesting the termination motion as to her three oldest children but that she expected to contest the motion as to S.S. The court determined that the Department had made reasonable efforts

---

3. N.A., the oldest child, was hospitalized on February 19, 2001, "due to a violent outburst where he threatened to kill himself and his siblings." He was diagnosed with reactive attachment disorder and was placed at Children's Ark Residential Treatment Center ("Children's Ark") on March 2, 2001, after S.C. claimed she was unable to care for him at her home "due to his violent tendencies." N.A. remained at Children's Ark until June 2002, when he was placed into a foster home.

to avoid permanent placement of the children outside of the home and thus informed the parties that the termination hearing would proceed as planned. Between the November 17 hearing and the December 4 termination hearing, C.S. was again given written notice of the Department's intentions and advised of the very real possibility of termination. Additionally, the court extended the deadlines for C.S. to undertake discovery.

At the December 4 hearing, the court granted Davis's motion to withdraw based on C.S.'s refusal to help her counsel prepare an adequate defense. C.S. assented to the withdrawal despite the court's warning that she would not be granted a continuance to find new counsel.

Nevertheless, C.S. moved to continue the trial, explaining that she needed time to find a new attorney. The court denied the motion, finding that C.S.'s request resulted from a desire to delay the trial. The court found that it was contrary to the best interests of the four children to continue the matter any further. C.S. then reasserted that she would not contest termination of her parental rights as to N.A., I.S., and D.S.

The court nonetheless conducted a full termination hearing for all four children, requiring the Department to prove by clear and convincing evidence that termination was appropriate. The effect of C.S.'s confession to termination as to N.A., I.S., and D.S., the court explained, was that she would not be permitted to rebut the Department's evidence as to those children. She would, however, be allowed to put on a full defense as to S.S. Following a two-day hearing, the court found: that C.S. was unstable and unable to provide a home for the children, having had thirteen residences over the preceding year; that she did not comply with the treatment plan or the visitation orders; and that she did not have healthy bonds with the children, particularly S.S. At the end of the hearing, on December 5, 2001, the magistrate therefore ordered the parent-child relationship terminated as to all four children. The magistrate also informed C.S. that she had an absolute right to appeal the order, equivocating as to whether the appeal had to be filed within ten or fifteen days of the order. Addi-

tionally, the magistrate failed to explain whether the time for appeal began on December 5 or on the date when the written order was ultimately signed and entered. For her part, C.S., at the court's suggestion, promptly requested on December 5, 2001, the appointment of new counsel to help with the appeal.

On December 28, 2001, the magistrate mailed a copy of the termination order notifying the parties (but not C.S.'s counsel, as no counsel was in place until January 7, 2002) that they had seven days to file an objection to the "form" of the magistrate's order before the order would then be signed and entered. No objection was filed. The court appointed Elizabeth Strobel as C.S.'s attorney on January 7, 2002. On January 16, 2002, the court entered its written order of termination. This written order gave notice to the parties that if they wished to appeal the order to the district court, they would have to file such appeal within five days of the date of execution of the order. The notice further stated that review by the district court was a prerequisite to review by the court of appeals. No copy of this order was sent to Strobel. Instead, Strobel obtained her own copy of the order at the clerk's office, some time near the end of January.

Instead of filing a petition for review of the magistrate's order within five days of January 16, 2002, Strobel filed a notice of appeal with the court of appeals on March 18, 2002, believing that a direct appeal to the court of appeals was proper. While the last day to file an appeal with the court of appeals would technically have been March 2, 2002, the court of appeals initially allowed the late appeal. However, on May 29, 2002, the court of appeals issued an order to show cause as to why the appeal should not be dismissed, given that a petition for review had not been filed with the district court. Strobel claimed that she did not realize a magistrate had entered the termination order until she received the order and thus was not aware until then that review by the district court was necessary. The court of appeals dismissed the appeal on June 17, 2002, and Strobel filed a motion with the district court

on July 22, 2002, for leave to file an untimely petition for review. The Department filed no objection to the motion.

On August 8, 2002, the court granted the motion and counsel filed her petition for review on August 29, 2002. The Department filed a late response to the petition on September 20, 2002, arguing that the magistrate's order should be affirmed by the district court. The district court affirmed the magistrate's order on October 8, 2002, and counsel filed a notice of appeal of the district court's decision with the court of appeals on November 21, 2002, within the forty-five days required by C.A.R. (4)(a).

On March 14, 2003, the court of appeals again issued an order to show cause why the appeal should not be dismissed based on C.S.'s failure to file the petition for review within five days of January 16, 2002. C.S. responded to the order on March 28, 2003, indicating that the court of appeals' only prerequisite to jurisdiction—C.S.'s petition for review—had been satisfied and that the appeal should proceed. On April 11, 2003, the court of appeals again dismissed C.S.'s appeal on the grounds that it lacked jurisdiction to hear the appeal since her petition for review of the magistrate's order was not filed with the district court within five days of the entry of order, as required by statute. We granted certiorari in this case on June 16, 2003.

On appeal to this court, C.S. contends that the court of appeals erred in dismissing her appeal, arguing that the court had jurisdiction to hear her appeal because the petition for review to the district court—timely or untimely—was the only prerequisite to that court's jurisdiction, and such a petition had been filed. We granted certiorari on this question and also instructed the parties to brief the case on the merits.

## III. Jurisdiction

 The court of appeals dismissed C.S.'s appeal on the grounds that she did not file a petition for review of the magistrate's order with the district court within the five days required by section 19–1–108(5). In a brief order, the court ruled that because "the statute does not allow for an extension [of] time for filing beyond the five-day period," the district court's order affirming the termination was void. Thus, the court held that it was without jurisdiction to hear the appeal. We conclude that the district court did not lose its jurisdiction despite the late filing, and instead, retained the authority to excuse the untimeliness of C.S.'s petition. Accordingly, the court of appeals had jurisdiction to hear the appeal of the district court order affirming the magistrate's termination order. Therefore, we reverse the court of appeals' decision dismissing C.S.'s appeal.

By virtue of the Colorado Children's Code, § 19–1–101, et seq., 6 C.R.S. (2003), the district court has exclusive original jurisdiction to hear matters pertaining to the termination of the legal parent-child relationship. § 19–1–103(70), 6 C.R.S. (2003); § 19–1–104(1)(d), 6 C.R.S. (2003).[4] Under section 19–1–108(1), the district court may delegate its authority to hear such proceedings to magistrates. However, the district court retains its jurisdiction in all cases. § 19–1–108(3)(a). In a case heard by a magistrate, the parties are bound by her findings and recommendations subject to a petition for review. *Id.* In termination proceedings, section 19–1–108(5) states that "[a] request for review shall be filed ... within five days" of the magistrate's order. Subsection (5) further states that "[a] petition for review shall be a prerequisite before an appeal may be filed with the Colorado court of appeals or Colorado supreme court." *Id.* According to the court of appeals' reading of the statute, under no circumstances may the district court entertain an untimely petition.

 The time requirement of section 19–1–108(5) was added to the Colorado Children's Code in 1997 and has not been construed by this court. Ch. 138, sec. 4, § 19–1–108(5), 1997 Colo. Sess. Laws 515, 517. Of course, in interpreting any statute, we must strive to give effect to the legislative intent.

---

**4.** In all counties except the City and County of Denver, it is the juvenile division within the district court that hears matters relating to the Colorado Children's Code; in Denver, it is the juvenile court of the City and County of Denver. § 19–1–103(18), 6 C.R.S. (2003).

*City of Colorado Springs v. Powell*, 48 P.3d 561, 564 (Colo.2002). To do so, we look to the language of the statute and give words their plain and ordinary meaning. *Tidwell ex rel. Tidwell v. City and County of Denver*, No. 02SC532, 83 P.3d 75, 81, (Colo.2003). We must also adhere to the "general rule that provisions of the Children's Code should be liberally construed to accomplish the purpose [of] and to effectuate the intent of the legislature," *R.M. v. Dist. Ct.*, 191 Colo. 42, 44, 550 P.2d 346, 348 (1976), and we thus should avoid any technical reading of section 19–1–108(5) that would disregard the best interests of the child. In addition, where possible, we must construe the statute, as we must construe all statutes, in such a manner that would avoid questions of its constitutional validity. *Adams County Sch. Dist. v. Heimer*, 919 P.2d 786, 790 (Colo.1996). Finally, we must be mindful of the fact that a magistrate's order terminating parental rights affects that parent's fundamental liberty interests, *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), and that the right to appeal such an order is of significant import to the parent.

We recognize that neither section 19–1–108(5) nor C.R.M. 7(a), the rule generally governing a district court's review of the magistrate's order, provide any exception to a late-filed petition for review. However, interpreting the filing requirement of 19–1–108(5) liberally to account for the best interests of the child and avoiding a construction of the statute that would call into question its constitutional validity, we hold that under 19–1–108(5), a district court retains jurisdiction to consider a late-filed petition when the delay is the result of excusable neglect. In deciding whether to exercise its discretion to entertain a late petition, the district court should not only take into account the reasons for the delay, but also the children's need for finality in the proceedings.

Here, the district court apparently concluded that the delay was excusable although it made no findings to that effect. However, there was no objection to the late filing,— either by the guardian ad litem or by the Department—and therefore, the question of whether the delay was a result of excusable neglect has not been preserved for review and we need not address it. As a result, any objection to the district court's decision to excuse the late filing of the petition has been waived.

The Department argues that the timeliness of the petition is a matter of subject matter jurisdiction and, thus, cannot be waived. However, as we have held, section 19–1–108(5) neither grants nor denies the district court the subject matter jurisdiction over proceedings under the Children's Code. *See People in Interest of A.M.*, 786 P.2d 476, 478–79 (Colo.App.1989)(interpreting C.R.J.P. 4's requirement that a dependency and neglect petition be filed with the district court within ten days from the day the child is taken into custody as a rule not affecting the court's jurisdiction such that a failure to object in time to the child's extended custody will waive the requirement). Instead, the time requirement of 19–1–108(5) is a procedural rule that creates a condition precedent to the party's right to appeal the magistrate's order. Because such procedures can be waived and because the Department failed to raise the requirements of 19–1–108(5) before the district court reviewed C.S.'s petition, the Department has waived any argument under 19–1–108(5). *Horton v. Suthers*, 43 P.3d 611, 617–618 (Colo.2002)(holding that Crim. P. 35's requirement that criminal defendants file a motion for relief with the state court before proceeding to habeas corpus implicates the doctrine of exhaustion of legal remedies and not the concept of subject matter jurisdiction, and any argument based on Crim. P. 35 is therefore waivable); *see also Ex Parte H.F.*, 843 So.2d 190, 191–92 (Ala. 2002) (holding that the state's failure to object to a late petition for appeal of a termination order granted by the trial court on the basis of excusable neglect constituted a waiver of the state's right to contest excusable neglect on appeal to the court of appeals).

In summary, we hold that the district court retained jurisdiction beyond the five-day statutory period to consider a petition for review of the magistrate's order, and had the discretion to forgive the delay based upon a showing of excusable neglect. Since

there was no opposition to the request for extension of time, the question of whether the neglect was, in fact, excusable is not before us.

Section 19–1–108(5) does require a timely filed petition for review as a prerequisite to appeal. In this case, the district court order forgiving the delay in the filing of the petition for review rendered that petition timely and satisfied the statutory mandate. Hence, the court of appeals did have jurisdiction to review the issues presented on appeal.[5]

## IV. Substantive Issues

Because we have concluded that the court of appeals erred in dismissing the appeal, the substantive issues are ripe. Rather than remanding this case back to the court of appeals to address the merits, we do so here.

### A. *Withdrawal of Counsel and the Motion to Continue*

C.S. first contends that the termination hearing conducted by the magistrate violated her fundamental constitutional right to due process because, she asserts, she was entitled to a continuance of the December 4, 2001, hearing to find a new attorney after the withdrawal of Davis (the second court-appointed attorney). C.S. insists that in denying her motion to continue, the trial court denied her the right to counsel and, at a minimum, the court should have warned her of all the specific consequences of appearing pro se.

This argument boils down to a contention that she should not have been required to proceed with the termination hearing without counsel. Given the record and the applicable statutes in this case, we are not persuaded.

### 1. No Constitutional Right to Counsel

■■■■ A parent's right to appointed counsel in termination proceedings is secured by statute and not constitutional mandate. § 19–1–105(2), 6 C.R.S. (2003); § 19–3–202(1), 6 C.R.S. (2003); *see People in Interest of V.A.E.Y.H.D.*, 199 Colo. 148, 152, 605 P.2d 916, 919 (Colo.1980). In *Lassiter v.*

*Dept. of Social Services*, 452 U.S. 18, 31, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981), the U.S. Supreme Court held that while parental termination proceedings indeed implicate a parent's fundamental liberty interests, the Constitution does not require the appointment of counsel in every case. To the contrary, the Court stated that there is a "presumption that there is no right to appointed counsel in the absence of at least a potential deprivation of physical liberty." *Id.; see also In re Marriage of Hartley*, 886 P.2d 665, 674 n. 16 (Colo.1994) ("It is important to note that the constitutional right to assistance of counsel is limited to adult proceedings which are criminal in nature and equivalent juvenile cases.").

The Court noted that "child-custody litigation must be concluded as rapidly as is consistent with fairness." *Lassiter*, 452 U.S. at 32, 101 S.Ct. 2153. In determining whether a parent has the right to have counsel appointed in a termination proceeding, a court is to review:

> whether the three [*Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)] factors, when weighed against the presumption that there is no [constitutional] right to appointed counsel in the absence of at least a potential deprivation of physical liberty, suffice to rebut that presumption and thus to lead to the conclusion that the Due Process Clause requires the appointment of counsel when a State seeks to terminate an indigent's parental status.

*Lassiter*, 452 U.S. at 31, 101 S.Ct. 2153.

■■■■ Accordingly, in reviewing a respondent parent's right to counsel, a court is to consider: whether "the parent's interest is an extremely important one;" whether "the State shares with the parent an interest in a correct decision, has a relatively weak pecuniary interest, and, in some but not all cases, has a possibly stronger interest in informal procedures;" and whether "the complexity of the proceeding and the incapacity of the uncounselled parent could be, but would not always be, great enough to make the risk of an erroneous deprivation of the parent's rights insupportably high." *Id.* Hence, due

---

5. Because we reverse the court of appeals' dismissal, we need not address C.S.'s argument that

the court of appeals' decision deprived her of procedural due process.

process requires the appointment of counsel only where the parent's interests are at her strongest, where the state's interests are at their weakest, and the risks of error are at their peak. *Id.*

Here, C.S.'s interests at stake in the proceeding were indeed extremely important. *Stanley*, 405 U.S. at 651, 92 S.Ct. 1208. However, also infused into the balance were the children's interests, which dictated that the court achieve some permanency in their lives. Both the Department and the guardian ad litem opposed any continuance as contrary to the best interests of the children. More to the point, C.S. was clearly warned on several occasions to cooperate with her appointed attorney or proceed pro se, and she was given the opportunity to contest her lawyer's withdrawal at the termination hearing.[6] The Department and the court rightly feared that C.S. was motivated by a desire to delay the proceedings.

We also conclude that the risk of error was low in this case. In *Lassiter*, the Court determined that the risk of erroneous deprivation, as described in *Eldridge*, was low and thus rejected the parent's assertion that she was unconstitutionally permitted to appear pro se in a parental termination proceeding after noting that the state's evidence against her was so great as to make the presence of counsel of little benefit. *Lassiter*, 452 U.S. at 32–33, 101 S.Ct. 2153. The Court first remarked that no experts had testified at the hearing and there were "no especially troublesome points of law, either procedural or substantive" that characterized the hearing. *Id.* at 32, 101 S.Ct. 2153. Also relevant to its inquiry, the Court held, was the mother's failure to contest the termination proceeding and her failure to speak to her retained lawyer after notification of the hearing. *Id.* at 33, 101 S.Ct. 2153. Because these combinations of factors rendered the proceeding fundamentally fair, the trial court found no error in failing to appoint counsel for the mother.

We conclude that, like the proceeding in *Lassiter*, the simplicity of the hearing and the weight of the evidence against C.S. presented at the hearing were such that the absence of counsel did not render the proceeding fundamentally unfair. The Department presented four different witnesses, all thoroughly familiar with C.S. and her children after years of involvement during the dependency and neglect proceedings. C.S., who began the hearing with counsel, had no witnesses subpoenaed for the hearing, and, like the mother in *Lassiter*, did not contest the motion as to three of her children. Further, the reason she had no counsel was because of her failure to cooperate with him.

Given the weight of evidence and the history of the case, there was little that a third court-appointed attorney could have done in this hearing to turn the tide in C.S.'s favor. With all of those factors in mind, therefore, we conclude that the risk of erroneous termination in this instance was low.

Because we conclude that C.S.'s fundamental right to the assistance of counsel was not implicated in this case, we further conclude that the court was not required in this instance to give C.S. a detailed advisement regarding her decision to appear pro se.[7] *See Schneckloth v. Bustamonte*, 412 U.S. 218, 237, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)

---

**6.** The magistrate provided a written advisement to C.S. after the November 17, 2001, hearing, stating:

> You must cooperate with your attorney so that your lawyer can adequately represent you on the motion to terminate the parent-child relationship. Your failure to keep in contact or otherwise cooperate with your lawyer may result in your lawyer withdrawing from your case. If this happens you may have to go to a hearing on the motion without having a lawyer represent you. ☐ The Court expects that the hearing will take place as scheduled unless a manifest injustice will occur if it is held as scheduled. It

> would be unfair to your children and the other parties to this case to postpone the hearing that has been set in this matter.

**7.** C.S. cites to *Faretta v. California*, 422 U.S. 806, 835, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), in which the United States Supreme Court held that in criminal cases, the Sixth Amendment requires a waiver of the right to counsel to be knowing and intelligent. Even if the Sixth Amendment applied here, which it does not, there is no evidence in the record from which we would reasonably infer that the waiver was not made voluntarily and knowingly. *People v. Arguello*, 772 P.2d 87, 92 (Colo.1989).

("Almost without exception, the requirement of a knowing and intelligent waiver has been applied only to those rights which the Constitution guarantees to a criminal defendant in order to preserve a fair trial."); *see also People v. Duran,* 757 P.2d 1096, 1097 (Colo.App.1988)("Because defendant's right to counsel in [a] Crim. P. 35 proceeding is statutory and not constitutional, its waiver must be voluntary but need not be knowing and intelligent."). Indeed, it appears to us, based on the circumstances leading to Davis's withdrawal, that C.S. knew very well what risk her conduct posed. *See People in Interest of D.J.P.,* 785 P.2d 129, 131 (Colo. 1990) ("The totality of the circumstances is relevant when determining whether the trial court committed an abuse of discretion by denying a continuance."); *see also People v. Arguello,* 772 P.2d 87, 94 (Colo.1989)(holding that in determining whether there exists a valid waiver of the right to counsel in the criminal setting, the court may consider "[a] defendant's lack of good faith in working with appointed counsel," "including an unreasonable refusal to cooperate with counsel" "or an unreasonable request for substitution of appointed counsel," and "[t]he timeliness of defendant's request for new counsel" particularly "when a defendant makes an untimely request for new counsel … under circumstances which are likely to result in a continuance").

## 2. No Abuse of Discretion in Denying Continuance

■■■■ Because the denial of C.S.'s motion to continue did not affect her fundamental rights, we review the district court's order only for abuse of discretion. Importantly, in this analysis, we note that the Children's Code specifically directs the court to proceed "with all possible speed to a legal determination that will serve the best interests of the child." 19–1–102(1)(c), 6 C.R.S. (2003). The Children's Code is a careful balancing of rights and interests: those of the parents whose parental rights are at issue, and those of the child himself, who needs a stable, permanent home. Because of the delicate balancing that the statute contemplates, trial courts necessarily retain significant discretion to evaluate the circumstances of the case as they unfold. In that vein, "[a] motion for

a continuance is generally addressed to the sound discretion of the trial court, as are a party's motion to discharge an attorney and an attorney's motion to withdraw." *People in Interest of M.M.,* 726 P.2d 1108, 1121 (Colo.1986)(internal citations omitted). Importantly, "the court's ruling on such motions will not be disturbed on review in the absence of a clear abuse of discretion." *Id.* In ruling on a motion to withdraw and an interrelated motion for continuance, "the trial court should consider the need for orderly and expeditious administration of justice and should balance that need against the particular facts underlying the motion." *Id.* The court should also weigh whether a grant or denial of the motions will result in substantial delay that would both inconvenience witnesses and subject the interested children to further uncertainty about their future. *Id.*

Because the court concluded that the best interests of the children dictated that the hearing proceed to avoid further uncertainty and instability in their lives, and because the court ruled on the motions to continue and withdraw while weighing the need for the orderly and expeditious administration of justice against the circumstances of the case, we hold that the court did not abuse its discretion in denying the request for continuance.

## 3. Failure to Advise on Confession to Motion

■■■ C.S. next argues that the district court erred in not informing her of all the possible consequences of confessing the Department's motion to terminate her parental relationship with N.A., I.S., and D.S. She explains that because the hearing affected her fundamental rights as a parent, she was entitled to a full advisement concerning the effect of her decision. While we have already affirmed that a natural parent has a "fundamental liberty interest in the care, custody and management of his or her child," we have also held that the General Assembly has safeguarded this fundamental interest by enacting the Termination Act. *B.B. v. People,* 785 P.2d 132, 136 (Colo.1990). In *B.B.,* we determined that the Termination Act furthered "the legislative purposes of preserving

and strengthening family ties whenever possible while still protecting the child's welfare." *Id.* (recognizing that the pertinent protection has been codified under section 19–3–604, 6 C.R.S. (2003)). There, we also concluded that the detailed procedures and criteria provided under the Termination Act adequately protect a parent's fundamental rights. *Id.* Thus, to determine whether C.S.'s fundamental rights were protected when she confessed the Department's motion, we need only determine whether the proceedings substantially complied with the statute. *See A.M.D.,* 648 P.2d at 631.

Tellingly, C.S. alleges no particular constitutional error and no statutory violation on the part of the court in failing to detail all of the consequences of a confession of the termination petition. Furthermore, a review of all the circumstances surrounding the termination proceeding indicates that her assertion is baseless. We determine, based on the totality of the circumstances surrounding the dependency and neglect proceedings and the orders of termination, that C.S. knowingly and intelligently waived her right to contest the motion for termination as to N.A., I.S., and D.S. Nothing in the record suggests that she was unaware of the effect of her decision. Because C.S. was a party to the dependency and neglect proceedings for all four children in a heavily monitored process spanning nearly three years, it is inconceivable that she was unaware of the potential consequences of the termination hearing.

Indeed, after each dependency and neglect proceeding began, and at every significant stage of these two cases, C.S. was provided with a written notice from the court that the irreversible termination of the parent-child relationship was a possibility. During all phases of the proceedings, C.S. was represented by counsel and at the pre-trial hearing on November 15, 2001, with counsel present, C.S. indicated to the court that she was not going to contest termination for her three oldest children. At the termination hearing, she stated that the only other option she would consider was relinquishment of the children to their maternal aunt. However, after the children's guardian ad litem, Troy Hause, who explicitly disclosed his alignment with the Department at the hearing, informed the court and C.S. that the only effect of the relinquishment would be to delay the permanent placement of her children, C.S. decided against relinquishment and confessed the termination motion. The court then informed C.S. that the termination trial would proceed and that the Department was still required to prove that termination was necessary by clear and convincing evidence. The effect of her decision at trial, the court explained, was that C.S. could not present her own evidence as to the three older children.

When C.S. informed the court that she wanted to contest the termination motion concerning S.S., she said that she understood that I.S. and D.S. were likely to be permanently placed with her sister and that they would be "in good hands." C.S. also stated to the court that after the termination, she would have to seek counseling in order to cope with the loss of her children. She explained that the only reason she wished to contest the termination motion concerning S.S. was that the Department sought placement outside the family. Thus, we conclude that the record, including C.S.'s own expressions, reveals a clear understanding on the part of C.S. of the effects of parental termination and her decision to confess the Department's motion.

C.S. further claims that her decision to confess the motion was invalid since it was influenced by the information provided by Hause, a person with interests adverse to her own. Unavailingly, she cites to *People v. Legler,* 969 P.2d 691, 694 (Colo.1998), as authority for the proposition that Hause improperly counseled her on her ultimate decision not to contest termination for three of her children. *Legler,* however, merely acknowledged that, by statute, in a criminal investigation, a juvenile is entitled to have a non-hostile adult present during custodial interrogation. *Id.* Accordingly, it has no application here, and we find nothing inherently improper about the exchange between Hause and C.S.

Procedurally, then, our review of the court's order presents no reversible error

and we now turn to the termination order as to S.S.

## B. *Termination Order*

██ Finally, C.S. argues that in terminating her parental rights as to S.S., the district court did not comply with section 19–3–604. She does not dispute the underlying basis for the order of termination as to the three older children, N.A., I.S., and D.S. She does contest the basis of termination as to the youngest child, asserting that in the order, the court erroneously failed to consider and implement less drastic alternatives to termination. Specifically, she contends that the court should have addressed the possibility of placement with S.C., the maternal aunt, in whose care I.S. and D.S. resided. However, we hold that the district court was required only to comply with section 19–3–604 in terminating the parent-child relationship between C.S. and S.S. Because the court in this case conformed its findings and order to section 19–3–604 and because the Children's Code does not specifically require a district court to look at interfamilial placement before terminating a parent-child relationship, we conclude that the court did not err in this instance.

The Colorado Children's Code exclusively sets out the requirements a district court must follow in terminating the parent-child relationship. Section 19–3–602(1), 6 C.R.S. (2003), mandates that "[t]ermination of a parent-child legal relationship shall be considered only after the filing of a written motion alleging the factual grounds for termination, and termination of a parent-child legal relationship shall be considered at a separate hearing following an adjudication of a child as dependent or neglected." Broadly stated, section 19–3–604(1) permits the court to order termination of the legal parent-child relationship based "upon the finding by clear and convincing evidence" that: (a) "the child has been adjudicated dependent and neglected and has been abandoned" by the parent or parents; (b) the child has been adjudicated dependent or neglected "and the court finds

that no appropriate treatment plan can be devised to address the unfitness of the parent or parents;" or (c) the child has been adjudicated dependent and neglected and the court finds that:

> (I) an appropriate treatment plan approved by the court has not been reasonably complied with by the parent or parents or has not been successful or that the court has previously found, pursuant to section 19–3–508(1)(e), that an appropriate treatment plan could not be devised [and] (II)[t]hat the parent is unfit [guided at least in part by the factors enumerated under 19–3–604(2)]; and (III)[t]hat the conduct or condition of the parent or parents is unlikely to change within a reasonable time.

In all cases, "the court shall give primary consideration to the physical, mental, and emotional conditions and needs of the child." § 19–3–604(3).

In this case, the district court entered its termination order under section 19–3–604(1)(c), specifically concluding that S.S. had been adjudicated dependent and neglected, that C.S. had not complied with and could not comply with the approved treatment plan, that C.S. was an unfit parent, and that her condition was unlikely to change within a reasonable time. While the court did not explicitly consider "less drastic alternatives" before ordering termination, nothing in the statute mandated that it do so at that juncture. Indeed, in *M.M.*, 726 P.2d at 1122, we interpreted section 19–3–604(1)(c) [8] and held that "[a]lthough [the statute] does not require a trial court to make an express finding that less drastic alternatives [to termination] have been considered and eliminated, we are convinced that a trial court's consideration and elimination of these alternatives are implicit in the statutory criteria for termination." We stated that

> we are satisfied that as long as the trial court's findings conform to the statutory criteria for termination and are adequately

---

**8.** At the time the case was decided, the termination statute then in effect was found in section 19–11–105, 8B C.R.S. (1986). Though it has been relocated, the statute has not been altered

in a way that would affect our analysis or interpretation of *People in Interest of M.M.*, 726 P.2d 1108, 1122 (Colo.1986).

supported by evidence in the record, a reviewing court may reasonably presume that, in the absence of any indication in the record to the contrary, the trial court considered and eliminated less drastic alternatives. *Id.* at 1123. Here, the lengthy history of the case reveals a clear pattern of attempting various other alternatives to the drastic termination proceeding.

Thus, in reviewing the validity of the court's termination order, we must only determine whether its findings conformed to the requirements of section 19-3-604(1)(c) and whether these findings were supported by clear and convincing evidence. *See People in Interest of M.S.H.*, 656 P.2d 1294, 1297 (Colo.1983). At the termination hearing, the Department presented testimony and evidence supporting the conclusion that S.S., an infant, needed permanency as soon as possible and that, despite all efforts to establish such permanency with S.S.'s mother, it had not occurred and, in fact, C.S. had failed to establish even a semblance of stability in her life.

### 1. Non-compliance with Treatment Plan

After finding that the child has been adjudicated dependent and neglected in a prior hearing by a preponderance of the evidence, *B.B.*, 785 P.2d at 136, the court must then determine whether the parent has complied with the treatment plan. § 19-3-604(1)(c)(I). Where the child is under six years of age, as S.S. was at the time of the hearing, noncompliance is evidenced where: (A) "[t]he parent has not attended visitations with the child as set forth in the treatment plan, unless good cause can be shown;" and (B) "[t]he parent exhibits the same problems addressed in the treatment plan without adequate improvement." § 19-3-604(1)(c)(I)(A) & (B).

At the hearing in this case, the Department presented the court with the report and testimony of the caseworker assigned to C.S.'s dependency and neglect matter, Jenna Reed. Both Reed's report and her testimony disclose C.S.'s failure to adhere to the Department's treatment plan.

In the treatment plan, the Department listed four needs that C.S. had to meet: (1) that C.S. obtain stable housing and employment; (2) that C.S. remain on drug and alcohol monitoring; (3) that C.S. complete and comply with the recommendations of a psychological evaluation; and (4) that C.S. enhance her parenting skills through regular work with a "bonding nurse."

Both Reed's and C.S.'s own testimony at the hearing showed that C.S. had lived at thirteen different places in just over a year's time, either in a motel or with friends or family. At the time of the hearing, C.S. was not working and, according to Reed, had not had stable employment since the case began—approximately two and a half years. C.S. was unable to rebut any of this evidence.

Further, Reed reported that C.S. discontinued her drug and alcohol monitoring and that her failure to obtain stable housing and employment represented a failure to comply with the recommendations of the psychological evaluation. Additionally, Reed's report and the testimony of Patricia McClain—the bonding nurse—demonstrated a failure to comply with the parenting skill recommendations. McClain testified that C.S. regularly missed visitation appointments and failed to make six out of nine feedback sessions. She also stated that C.S. had not bonded as a mother to S.S. C.S. was unable to rebut this evidence as well.

### 2. Parent is Unfit

Section 19-3-604(1)(c)(II) also required the court to find that C.S. was "unfit" to be a parent to S.S. In making this determination, section 19-3-604(2) directs the court to consider—but does not limit the court to—several enumerated factors before finding that the parent's "conduct or condition of the parent renders [her] ... unable or unwilling to give the child reasonable parental care to include, at a minimum, nurturing and safe parenting sufficiently adequate to meet the child's physical, emotional, and mental health needs and conditions." The statute expressly permits the court to consider whether the parent's "[e]motional illness, mental illness, or mental deficiency [is] of

such duration or nature as to render the parent unlikely within a reasonable time to care for the ongoing physical, mental, and emotional needs and conditions of the child." § 19-3-604(2)(a); § 19-3-604(1)(b)(I).

In support of its findings, the court had before it the information in Reed's report, as discussed above, which, the court found, established that reasonable efforts by the Department had failed to rehabilitate C.S. as a parent, also an enumerated factor under section 19-3-604(2)(h). As well, the court considered the testimony of Dr. Gardner, who testified at the hearing concerning his psychological evaluation of C.S. He reported that C.S.'s permanent psychological state was such that she would likely never be emotionally intimate with her children and that she had further failed to demonstrate any ability to keep "a safe, secure home for her children or herself." He emphasized that C.S.'s inability to trust others would severely inhibit her capacity to seek the help she needed to become a fit parent. Finally, the court also noted that S.S. had been outside the custody of his mother for nearly fifteen of his twenty months of life, an additional factor to be considered by the court. *See* § 19-3-604(2)(k). Despite the testimony of C.S.'s one witness, and C.S.'s own protestations, there was adequate support in the record to find C.S. an unfit parent.

### 3. Conduct or Condition of the Parent Unlikely to Change

 Finally, the court had to find by clear and convincing evidence that C.S.'s conduct or condition making her unfit and leading to her failure to comply with the treatment plan were "unlikely to change within a reasonable time." § 19-3-604(1)(c)(III). Dr. Gardner and Reed both reported that there was no reasonable probability, based on their own evaluations and monitoring, that C.S. was going to achieve stability in her life anytime soon. While the evidence certainly showed that C.S. was trying to improve her situation, it also showed that she had had little success during the crucial treatment period, the period that Reed claimed would be the best indicator of C.S.'s future condition. Dr. Gardner further explained that

C.S. would have to expend considerable time and effort before her own mental state was conducive to raising S.S. The court thus concluded that C.S. was simply unable to commit to achieving the one thing that it determined was truly needed for S.S.'s emotional and physical well-being—a stable home.

Accordingly, we conclude that there is ample evidence in the record to support the district court's order of termination. Moreover, we determine that the court carefully conformed its findings to the Termination Act, giving "primary consideration to the physical, mental, and emotional conditions and needs of the child," as directed by the statute. § 19-3-604(3). Thus, we affirm the order of termination as to S.S. entered by the district court in this case.

### V. Conclusion

This case demonstrates a tragic disintegration of a family, resulting in the mother losing her parental rights to all four of her children. However, the proceedings were conducted with due regard for her rights, in conformity with the statutes and with appropriate focus on the best interests of the children.

We therefore uphold the termination orders as to all of those children, on procedural and substantive grounds, and return this case to the trial court for any further proceedings.