25CA0416 Peo in Interest of AEW 08-21-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 25CA0416
City and County of Denver Juvenile Court No. 22JV30769
Honorable Laurie A. Clark, Judge

---

The People of the State of Colorado,

Appellee,

In the Interest of A.E.W., a Child,

and Concerning A.M.W.,

Appellant.

---

JUDGMENT AFFIRMED

Division V
Opinion by JUDGE JOHNSON
Welling and Grove, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced August 21, 2025

---

Katie McLoughlin, Acting City Attorney, Amy J. Packer, Assistant City Attorney, Denver, Colorado, for Appellee

Josi McCauley, Guardian Ad Litem

Lindsey Parlin, Office of Respondent Parents' Counsel, Denver, Colorado, for Appellant

¶ 1     A.M.W. (father) appeals the judgment terminating his parent-child legal relationship with A.E.W. (the child).  We affirm.

## I.     Background

¶ 2     The Denver Department of Human Services (the Department) filed a petition in dependency or neglect alleging, as relevant here, domestic violence and housing instability.  Nine months before the petition was filed, the parents placed the then-three-year-old child with paternal grandmother on a voluntary basis, where she remained for the duration of the case.

¶ 3     Father agreed to a deferred adjudication approximately five months after the petition was filed.  Nearly one year later, the court revoked father's deferred adjudication and adopted a treatment plan with conditions nearly identical to the requirements of the deferred adjudication.  Father's treatment plan required him to (1) complete a domestic violence evaluation and any recommended treatment; (2) engage in a substance abuse component if deemed necessary based on a hair follicle test; (3) maintain stable housing and a verifiable source of income; (4) attend family time; and (5) cooperate with the Department.

¶ 4     Approximately two years after the petition was filed and over five months after father's deferred adjudication was revoked, the Department moved to terminate his parental rights. After a contested hearing, the juvenile court granted the termination motion.

## II.     Request for Continuance

¶ 5     Father argues that the juvenile court abused its discretion by denying his motion to continue the termination hearing. We disagree.

### A.     Standard of Review and Applicable Law

¶ 6     We review the denial of a continuance for an abuse of discretion. *See C.S. v. People in Interest of I.S.*, 83 P.3d 627, 638 (Colo. 2004). Under this standard, we will not disturb the juvenile court's decision absent a showing that it was manifestly arbitrary, unreasonable, or unfair, or was based on a misunderstanding or misapplication of law. *People in Interest of M.B.*, 2020 COA 13, ¶ 41; *People in Interest of T.M.S.*, 2019 COA 136, ¶ 10.

¶ 7     The Colorado Children's Code directs courts to "proceed with all possible speed to a legal determination that will serve the best interests of the child." § 19-1-102(1)(c), C.R.S. 2024. Thus, when

ruling on a motion to continue, the juvenile court "should balance the need for orderly and expeditious administration of justice against the facts underlying the motion and the child's need for permanency." *People in Interest of R.J.B.*, 2021 COA 4, ¶ 11. In expedited permanency planning (EPP) cases, such as this one, a court cannot grant a continuance unless the moving party establishes (1) good cause for the continuance and (2) that the continuance will serve the child's best interests. § 19-3-104, C.R.S. 2024.

## B. Analysis

¶ 8 At the beginning of the termination hearing, father's attorney moved for a continuance because father was in the hospital with heart issues. The attorney showed the court a text message from father containing a photograph of a hospital bracelet. But the court found that the photo could not be "authenticated in any way" and it was unclear whether it was even from father.

¶ 9 Thus, the juvenile court denied father's motion for a continuance but said it would reconsider its ruling if father provided medical documentation. In doing so, the court found that the case had been open for over two years, that this was an EPP

3

case, that a further delay would not be in the child's best interest, and that there was no "basis . . . to keep [the child] in limbo." The court further found that it had "an obligation to give [the child] permanency and balance [father]'s due process rights with that." The court also noted that it would "absolutely consider anything [father] file[d] in the future related to adding another date for him to testify . . . or vacate his portion of the hearing . . . and reset it."

¶ 10 Father appeared by telephone toward the end of the termination hearing and renewed his request for a continuance but failed to provide any medical documentation explaining his hospitalization. The court again denied father's request but invited him "to file what you need to file . . . and should we have additional documentation, I will address that when that is available." At the conclusion of the termination hearing, the court held the matter in abeyance for seven days to allow father to file additional information related to his hospitalization and request for a continuance. But the record contains no further filings from father.

¶ 11 Based on this record, we perceive no abuse of discretion in the juvenile court's ruling because the court properly weighed the need for orderly and expeditious administration of justice and the child's

need for permanency against the motion, which included an opportunity for father to supplement the record to support that he had been hospitalized. *See C.S.*, 83 P.3d at 638; *R.J.B.*, ¶ 11. Considering that the case had been pending for over two years, and the family had worked with the Department for two years before that — accounting for most of the child's life — father did not establish that a continuance was in the child's best interests, nor did he establish good cause given the lack of documentation. *See* § 19-3-104.

### III.   Fit Within a Reasonable Time

¶ 12    Father next argues that the juvenile court erred when it found that he could not become a fit parent within a reasonable amount of time. We discern no error.

### A.   Standard of Review and Applicable Law

¶ 13    Whether the juvenile court properly terminated parental rights is a mixed question of fact and law. *People in Interest of A.M. v. T.M.*, 2021 CO 14, ¶ 15. We review the court's factual findings for clear error, but we review de novo its legal conclusions based on those facts. *People in Interest of S.R.N.J-S.*, 2020 COA 12, ¶ 10.

¶ 14    To terminate a parent-child legal relationship under section 19-3-604(1)(c), C.R.S. 2024, the juvenile court must find, by clear and convincing evidence, that the parent is unfit and that the parent's conduct or condition is unlikely to change within a reasonable time.  § 19-3-604(1)(c)(II), (III).

¶ 15    A parent is unfit if their conduct or condition renders them unable or unwilling to give their child reasonable parental care.  *People in Interest of D.P.*, 160 P.3d 351, 353 (Colo. App. 2007).  Reasonable parental care requires, at a minimum, that the parent provide nurturing and safe parenting adequate to meet the child's physical, emotional, and mental health needs.  *People in Interest of A.J.*, 143 P.3d 1143, 1152 (Colo. App. 2006).  In making this determination, the juvenile court must consider the specific needs of the child.  *See People in Interest of K.T.*, 129 P.3d 1080, 1081 (Colo. App. 2005).

¶ 16    A parent's noncompliance with a treatment plan generally "demonstrates a lack of commitment to meeting the child's needs" and can therefore be considered in determining parental fitness.  *People in Interest of D.P.*, 181 P.3d 403, 408 (Colo. App. 2008).  But even if a parent substantially complies with a treatment plan, the

6

parent may still be unfit if the plan did not successfully rehabilitate the parent. *People in Interest of K.B.*, 2016 COA 21, ¶ 26.

¶ 17 When deciding whether a parent's conduct or condition is likely to change within a reasonable time, the juvenile court may consider whether any change has occurred during the proceeding, the parent's social history, and the chronic or long-term nature of the parent's conduct or condition. *People in Interest of D.L.C.*, 70 P.3d 584, 588-89 (Colo. App. 2003). What constitutes a reasonable time is fact-specific and varies from case to case. *People in Interest of D.Y.*, 176 P.3d 874, 876 (Colo. App. 2007). But a reasonable time is not an indefinite time, and it must take into account the child's physical, mental, and emotional needs. *People in the Interest of S.Z.S.*, 2022 COA 133, ¶ 25.

## B. Analysis

¶ 18 Father argues that he could have become fit within a reasonable time because he completed his domestic violence evaluation and was committed to his domestic violence treatment. The juvenile court found that although father had partially complied with his treatment plan, he had not "internalized the services provided" to address concerns regarding his "lack of

7

respect for court orders" and "domestic violence behaviors." The court found that father continued to engage in "threats, (verbal) abuse, and aggression" and additional time would not change father's conduct or condition within a reasonable time. The record supports the court's findings. *See S.R.N.J-S.*, ¶ 10 (we must accept the juvenile court's factual findings if they have record support).

¶ 19 This case opened, in part, because father committed domestic violence against mother in the presence of the child. Father's treatment plan required him to complete a domestic violence evaluation and any recommended treatment. The caseworker testified that for father to successfully complete the domestic violence component of his treatment plan, he had "to internalize change on how to be a safe parent, how to manage anger, as well as understand the impact of his anger . . . on his child." The domestic violence treatment provider testified that father's evaluation categorized him as "the most significant, highest level of offender," based, in part, because he had violated probation and had previous domestic violence charges. To successfully complete treatment as a high-level offender, father had to (1) attend group therapy weekly; (2) participate in individual therapy with the DV treatment provider

once every sixty days; (3) have a second clinical contact (in addition to individual therapy) running concurrent with group therapy; and (4) complete assignments mandated by the Domestic Violence Offender Management Board (DVOMB).

¶ 20 Father attended some group therapy sessions and met with his treatment provider. But he did not complete any of the required DVOMB assignments. And he did not sign releases to authorize his treatment provider to confirm that he had engaged in a second clinical contact. The treatment provider testified that he was considering an unsuccessful discharge for father based on text messages father sent with "apparent comments about a disregard for protection orders, possible triangulation of a child between a high-conflict coparenting group, [and] disparaging remarks about a victim (mother) in the case." These text messages raised concerns for "victim safety" and illustrated that father was at "risk for re-offense." The treatment provider testified that father would not be able to successfully complete treatment if he did not internalize the skills domestic violence treatment was designed to instill, such as demonstrating empathy for victims.

¶ 21    The caseworker testified that father was merely completing a "checklist" when he engaged in domestic violence treatment, and that he "did not internalize change." Ultimately, the caseworker opined that father had not successfully completed the domestic violence component of his treatment plan because of "these ongoing text messages and the disparaging remarks that he has made towards [mother]" and "based on his lack of internalizing change."

¶ 22    Father also did not complete his domestic violence evaluation until approximately seventeen months after the petition was filed and one year after he agreed to a deferred adjudication in this EPP case. And he did not begin treatment until two months later. After engaging in treatment for approximately one month, he "fell off [the] radar" for another eight weeks. Thus, despite the age of the case, father began consistently engaging in group and individual therapy only three months before the termination hearing. The treatment provider testified that the fastest someone could complete treatment was nine months, but it could take up to sixteen months depending on their "internalization of the competencies and their completion of [] assignments." And the caseworker opined that father was not

likely to change within the next six months due to his history of domestic violence.

¶ 23 Next, father argues that he had frequent contact with the child and, therefore, they could have reunified if given additional time. But the juvenile court found, with record support, that father had contact with the child outside of professionally supervised parenting time which violated a protection order and illustrated father's "lack of respect for court orders."

¶ 24 The child was not in father's care prior to the filing of the petition and father refused to cooperate with the Department before the court case opened. After the petition was filed, father was not able to have contact with the child because of civil and criminal protection orders. Father's treatment plan required him to follow court orders, including protection orders, and to "work together with the caseworker to schedule regular parenting time." The caseworker testified that she encouraged father to resolve his active warrants and have the protection orders modified to allow him to have court-approved contact with the child. But the criminal protection order preventing any contact with the child was not lifted

until three months before the termination hearing, and the civil protection order allowed only professionally supervised visitation.

¶ 25    Father stated in text messages to the caseworker that no protection order would stop him from being around the child and that he would always get his way regardless of protection orders. The caseworker opined that father did not engage in his treatment plan because "he boast[ed] that he already sees his daughter and can access her whenever he wants." The record contains no information that father engaged in supervised visitation, but it shows that paternal grandmother facilitated frequent contact between father and the child in violation of the protection order and treatment plan. The caseworker testified that she was never "able to supervise or observe a visit with [father] and his daughter," so she could not give any "information as to how the relationship looks" and she had "not gotten any reports as to details of how . . . [their] relationship is with each other." Because of father's disregard for court orders, the caseworker opined that he had "not demonstrated that he is a fit parent."

¶ 26    Finally, father argues that he had stable housing and employment. The juvenile court acknowledged that father had

"been resourceful in obtaining employment and obtaining housing," but noted that "employment, state of residency, and housing has changed several times" during the case. The court concluded that father "did not engage in services and supports" to "obtain a residence suitable for the minor child" and did not "demonstrate an ability to meet [the child's] basic needs."

¶ 27 The caseworker testified that father had not maintained stable housing because of his incarceration and had several moves, including to Texas and Louisiana. Shortly before the termination hearing, father told the caseworker that he was at risk of eviction and planned to leave for Seattle. And at the time of the termination hearing, the caseworker did not know where father was residing. Although father reported various places of employment to the caseworker, he never provided the Department with any verification.

¶ 28 Based on this record, we will not disturb the juvenile court's conclusion that father's conduct or condition rendered him unfit and that his conduct or condition would not likely change within a reasonable time. *See S.Z.S.*, ¶ 29 (appellate court will not disturb

the juvenile court's finding that a parent could not become fit within a reasonable time when the record supports it).

## IV.   Conclusion

¶ 29    The judgment is affirmed.

JUDGE WELLING and JUDGE GROVE concur.