23CA2103 Peo in Interest of EMG 09-19-2024

COLORADO COURT OF APPEALS

Court of Appeals No. 23CA2103
Boulder County District Court Nos. 19JV290 & 20JV283
Honorable Dea M. Lindsey, Judge

The People of the State of Colorado,

Appellee,

In the Interest of Es.M.G., Ez.M.G., V.E.M. and Vi.M, Children,

and Concerning C.M.H.,

Appellant,

and V.M.,

Appellee.

JUDGMENT AFFIRMED

Division VII
Opinion by JUDGE SCHUTZ
Tow and Pawar, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced September 19, 2024

Benjamin Pearlman, County Attorney, Cheryl Koh-Sicotte, Assistant County Attorney, Boulder, Colorado, for Appellee The People of the State of Colorado

Josi McCauley, Guardian Ad Litem for Es.M.G., Ez.M.G., and V.E.M.

Alison A. Bettenberg, Guardian Ad Litem for Vi.M.

Andrew A. Gargano, Office of Respondent Parents' Counsel, Denver, Colorado, for Appellant C.M.H.

Just Law Group, LLC, John F. Poor, Denver, Colorado, for Appellee V.M.

¶ 1    C.H. (mother) appeals the judgment allocating parental responsibilities for (1) Es.M.G. and Ez.M.G. to C.F. (maternal great-aunt) and (2) V.E.M. and Vi.M. to L.P. (paternal grandmother). We affirm.

## I.    Background

¶ 2    In December 2019, the Boulder County Department of Housing and Human Services filed a petition in dependency and neglect based on allegations of domestic violence between mother and father V.M.  Es.M.G. and Ez.M.G., were placed with their father, J.M.G., while V.E.M. remained in mother's care.  After J.M.G. was deported to Mexico, the children returned to mother's care.  The juvenile court adjudicated the children dependent and neglected and adopted treatment plans for the parents.

¶ 3    In July 2020, mother gave birth to Vi.M.  A few months later, mother and V.M. were involved in another domestic violence incident, so the Department filed a new petition in dependency and neglect naming Vi.M. and it removed all four children from the home.  The Department eventually placed J.M.G.'s children, Es.M.G. and Ez.M.G. (the older children), with maternal great-aunt and V.M.'s children, V.E.M. and Vi.M. (the younger children), with

1

their paternal grandmother.  The juvenile court adjudicated Vi.M. dependent and neglected and adopted treatment plans for father V.M. and mother.

¶ 4    Mother's initial treatment plan required her to (1) communicate and cooperate with the Department and professionals; (2) address her mental health needs; (3) provide for the children's needs in a safe and stable environment; and (4) engage in appropriate family time with the children.  Specifically, mother's treatment plan required, among other things, that she work with a therapist to address her trauma and verbally aggressive behavior, as well as participate in weekly sessions with a Community Infant Program (CIP) therapist to better understand the children's needs.  When the juvenile court adopted a treatment plan in the second case, it also amended mother's initial treatment plan to require her to maintain a substance-free lifestyle.

¶ 5    In February 2023, the Department moved to terminate the parents' parental rights.  However, approximately three weeks before the scheduled termination hearing, the Department asked the juvenile court to convert the termination hearing to an allocation of parental responsibilities (APR) hearing.  The court

agreed to do so and held a four-day APR hearing in August 2023. After hearing the evidence, the court entered an APR that, as relevant here, gave (1) maternal great-aunt primary residential custody and sole decision-making authority for the older children; (2) paternal grandmother primary residential custody and sole decision-making authority for the younger children; and (3) no parenting time to mother until she "establishes proof of her participating consistently in trauma-based treatment for her mental health and substance abuse treatment for her sobriety." The court certified the APR order into the parents' previous domestic relations cases and closed the dependency and neglect cases.

## II. Indian Child Welfare Act

¶ 6 Mother first asserts that the juvenile court did not comply with the provisions of the Indian Child Welfare Act (ICWA) of 1978, 25 U.S.C. §§ 1901-1963, and Colorado's ICWA statute, § 19-1-126, C.R.S. 2024. Specifically, mother asserts that the court erred by failing to make proper inquiries and concluding that it did not have reason to know that the child was an Indian child. We disagree.

¶ 7 ICWA's inquiry provisions apply to dependency and neglect proceedings, including those resolved through an allocation of

3

parental responsibilities. *People in Interest of K.G.*, 2017 COA 153, ¶ 5, *overruled on other grounds by People in Interest of E.A.M. v. D.R.M.*, 2022 CO 42. We review de novo whether the juvenile court complied with ICWA. *People in Interest of T.M.W.*, 208 P.3d 272, 274 (Colo. App. 2009).

¶ 8     First, we disagree with mother's assertion that the juvenile court failed to properly inquire whether the children were Indian children. In dependency and neglect proceedings, a court must inquire of the parties at the commencement of the proceeding whether they know or have reason to know that a child is an Indian child. § 19-1-126(1)(a)(I)(A); C.R. ICWA P. 3(a). Mother submits that this language requires the court to make an ICWA inquiry at *every hearing*. But ICWA does not require this. *See* C.R. ICWA P. 3(c) ("A court may conduct multiple hearings within a child custody proceeding. This rule does not require an inquiry at each such hearing."). Rather, the inquiry should occur at the *first child custody hearing* in the case, such as an initial temporary custody hearing, and any subsequent new child custody proceeding, such as a proceeding to terminate parental rights. *Id.*; *see also* 25 U.S.C. § 1903(1)(i) (A "child custody proceeding" includes, as relevant here,

4

"'foster care placement'" which shall mean any action removing an Indian child from its parent or Indian custodian for temporary placement in a foster home or institution or the home of a guardian or conservator where the parent or Indian custodian cannot have the child returned upon demand, but where parental rights have not been terminated."); *K.G.*, ¶ 5.

¶ 9    In addition, if the court has information suggesting that the child may have Indian heritage but lacks sufficient information to have reason to know the child is an Indian Child, the juvenile court must direct the department to exercise due diligence to allow the court to obtain sufficient information to determine whether the child meets the definition of an Indian Child. § 19-1-126(3); C.R. ICWA P. 3(f); *see also E.A.M.*, ¶ 6.

¶ 10    In the present case, the juvenile court made an ICWA inquiry at the initial temporary custody hearing. Mother told the court that she did not think that she had any Indian heritage. After the Department filed the second case, the court again inquired into whether mother had any Indian heritage. This time mother said that she "would have to look into that." The court provided mother with an ICWA assessment form, which she later submitted and

indicated that she did not have any Indian heritage. Therefore, the record shows that the court made proper ICWA inquiries in this case. *See* § 19-1-126(1)(a)(I)(A); C.R. ICWA P. 3(a), (c); *People in Interest of C.A.*, 2017 COA 135, ¶ 15.

¶ 11    Second, the record does not establish that the juvenile court had reason to know that the children were Indian children. *See* § 19-1-126(1)(a)(I)-(II) (describing factors supporting a reason to know); 25 C.F.R. § 23.107(c) (2023). A mere assertion of Indian heritage, without more, is insufficient to give the court reason to know that a child is an Indian child. *E.A.M.*, ¶ 56. As noted, mother initially denied any Indian heritage, and the court found that it did not have reason to know that the child was an Indian child.

¶ 12    However, about a month before the APR hearing, mother submitted a new ICWA assessment form, in which she identified possible Shoshone heritage. In response to that disclosure, and in accordance with its obligations under section 19-1-126(3), the Department sent ICWA notices to all the Shoshone tribes. Most of those tribes indicated that the children were not members or eligible for membership. The other tribes did not respond, even

6

though they had received notice and had an adequate time to respond prior to the termination hearing. *See* 25 U.S.C. § 1912(a); *People in Interest of J.O.*, 170 P.3d 840, 842 (Colo. App. 2007) (noting that a hearing should not be held unless a tribe receives notice at least ten days before the hearing). Mother did not assert in the juvenile court, nor does she contend on appeal, that the Department failed to exercise due diligence under section 19-1-126(3) by sending notice to each of the Shoshone tribes.

¶ 13    Finally, we reject mother's contention that the Department failed to provide an appropriate notice to the Shoshone-Paiute Tribes of the Duck Valley Reservation. The record reveals that the Department sent a timely notice to these Tribes, but that they did not provide any response to the notice.

¶ 14    In sum, the record shows that the juvenile court made adequate ICWA inquires, and based on the information it received, the court did not have reason to know that the children were Indian children. *See* § 19-1-126(1)(a)(I)(A); C.R. ICWA P. 3(a), (c); *E.A.M.*, ¶ 56. The record also shows that the Department sent timely notices to the Shoshone affiliated tribes based on mother's assertion of possible heritage. And mother does not contend that

7

the Department failed to exercise due diligence under section 19-1-126(3). *See H.J.B. v. People in Interest of A-J.A.B.*, 2023 CO 48, ¶ 5. We therefore conclude that the court complied with ICWA and that ICWA does not apply in this case.

## III. Continuance

¶ 15    Mother next contends that the juvenile court erred by denying her motion to continue based on her counsel's inability to adequately prepare for the APR hearing. We disagree.

¶ 16    The Colorado Children's Code directs courts to "proceed with all possible speed to a legal determination that will serve the best interests of the child." § 19-1-102(1)(c), C.R.S. 2024. Thus, when ruling on a motion to continue, the juvenile court "should balance the need for orderly and expeditious administration of justice against the facts underlying the motion and the child's need for permanency." *People in Interest of R.J.B.*, 2021 COA 4, ¶ 11.

¶ 17    In expedited permanency planning cases where, as here, a child is under six years of age at the time the petition is filed a juvenile court cannot grant a continuance unless the moving party establishes (1) good cause for the continuance and (2) that the continuance will serve the child's best interests. § 19-3-104, C.R.S.

8

2024. If a court does grant a continuance under this section, then it must reschedule the hearing within thirty days. *Id.*

¶ 18 We review the denial of a continuance motion for an abuse of discretion. *See C.S. v. People in Interest of I.S.*, 83 P.3d 627, 638 (Colo. 2004). We will not disturb the juvenile court's decision absent a showing that it was manifestly arbitrary, unreasonable, or unfair. *People in Interest of M.B.*, 2020 COA 13, ¶ 41.

¶ 19 Less than a week before the APR hearing, mother moved for a continuance. In her motion, she asserted that the APR hearing should be continued so that the parties could engage in mediation. In response, the Department and the children's guardians ad litem (GALs) filed a motion to strike because mother's request for a continuance was untimely. Even though mother did not assert in her continuance motion that her counsel needed additional time to prepare, the Department and GALs noted that "preparation for a [termination] hearing versus an APR hearing is essentially the same given the facts of this case."

¶ 20 Mother then responded to the motion to strike, disagreeing with the suggestion that preparing for a termination hearing was the same as preparing for an APR hearing. For example, mother

reported that she was "prepared with one particular expert who was ready to testify as to why rights should not be terminated" but who "had not analyzed what parenting time mother should receive." Mother also argued that she would "likely no longer be able to utilize that expert if the continuance is not granted."

¶ 21 The juvenile court addressed the continuance motion at a pretrial conference three days before the start of the APR hearing. Mother's counsel did not provide any further detail for her request to continue, stating that the court was "aware of [her] client's position in regards to a continuance." The court denied the motion to continue, stating, as relevant here, that, because an "APR is a less drastic alternative to termination," mother's counsel "would certainly be prepared to talk about and argue and get experts involved, if they thought that that would be helpful to their position." The court then issued a written order, finding that mother had failed to establish that her counsel could not be prepared for an APR hearing and a continuance was not in the children's best interests.

¶ 22 We perceive no abuse of discretion in the juvenile court's ruling. *See C.S.*, 83 P.3d at 638. The court properly weighed the

10

need for orderly and expeditious administration of justice against the facts underlying the motion and the children's need for permanency. *See R.J.B.*, ¶ 11. Mother's counsel had provided only vague reasons why she could not be prepared for the hearing. Indeed, mother did not tell the court the name of the expert who she would "no longer be able to utilize." Nor did she specifically request more time to retain a new expert witness for the APR hearing. Rather, mother listed four potential expert witnesses on her exhibit list, three of whom testified at the hearing. The fourth witness was one of mother's therapists, and mother does not suggest that her therapist had any opinion about how much parenting time mother should be afforded in an APR.

¶ 23 One of mother's experts did opine that she should continue to have weekly visits in the community under the APR. What's more, the first case had been open for over three years, mother had the same attorney for the entire case, and mother's attorney had over six months to prepare for a termination hearing.

¶ 24 Notably, mother does not contest the juvenile court's application of section 19-3-104 to her request, and she does not address either of the statutory factors on appeal. Rather, she

11

simply asserts that the court's decision to deny the motion to continue violated her due process rights. As described above, mother had notice of the proceedings, an opportunity to present evidence and cross-examine witnesses, and the assistance of legal counsel. *See M.B.*, ¶ 30 (describing what process is due in dependency and neglect actions). And mother does not explain with any specificity what other evidence she would have offered if a continuance had been granted. *See People in Interest of E.B.*, 2022 CO 55, ¶ 22 (noting that a parent must establish "actual prejudice resulting from the juvenile court's denial of [a] requested continuance" to succeed on a due process claim).

## IV. Reasonable Efforts

¶ 25 Mother also argues that the juvenile court erred by allocating parental responsibilities because the Department did not make reasonable efforts to reunify her with the child. A department must make reasonable efforts in a dependency or neglect case before a court may enter an APR to a nonparent. *See People in Interest of A.S.L.*, 2022 COA 146, ¶ 20. Mother argues for the first time on appeal that the Department failed to make reasonable efforts to

12

reunify her with her children. We decline to address the merits of mother's reasonable efforts argument.

¶ 26    In civil cases, such as dependency or neglect proceedings, appellate courts will "review only issues presented to and ruled on by the lower court." *M.B.*, ¶ 14. To preserve an issue for appellate review, a party must alert the juvenile court to the issue so that the court has an adequate opportunity to make findings of fact and conclusions of law. *Forgette v. People*, 2023 CO 4, ¶ 21; *see also Brown v. Am. Standard Ins. Co. of Wis.*, 2019 COA 11, ¶ 21 ("If a party raises an argument to such a degree that the court has the opportunity to rule on it, that argument is preserved for appeal."). But a party is not required to use talismanic language to preserve an issue for appeal. *People in Interest of S.Z.S.*, 2022 COA 133, ¶ 18.

¶ 27    In her written closing argument, mother did not assert that the Department had failed to make reasonable efforts or ask the juvenile court to deny the motion for an APR as a result. Instead, mother agreed with an APR to the kinship providers, but argued for some limited decision-making responsibilities and liberal parenting time with the children. In other words, mother did not contest the

13

motion for an APR but rather disagreed with the Department's and fathers' proposed terms for the APR. The relief that mother now requests — reversing the APR and requiring the Department to make further efforts to rehabilitate her and reunify her with the child — is therefore contrary to the relief that she requested at the APR hearing.

¶ 28 To the extent that mother now asserts that she preserved her appellate contention by questioning the caseworker about the services (or lack thereof) provided by the Department, we are not persuaded. "[M]erely calling an issue or fact to the court's attention, without asking for any relief, is insufficient to preserve an issue for review." *Forgette*, ¶ 23.

¶ 29 Because mother never challenged the Department's reasonable efforts at the APR hearing, the juvenile court was not on notice that it needed to address whether the Department made reasonable efforts. *See id.* at ¶ 21. As a result, the court entered an APR without making specific findings as to whether the Department had made reasonable efforts. We are therefore unable to review the court's findings relative to the reasonableness of the department's efforts because the court did not make any. Rather, for us to review

14

mother's appellate claim, we would need to make factual findings, which we cannot do. *See Harriman v. Cabela's Inc.*, 2016 COA 43, ¶ 77; *see also S.Z.S.*, ¶ 21.

¶ 30 In sum, we conclude that mother did not properly preserve her argument that the Department failed to use reasonable efforts. *See People in Interest of E.C.*, 259 P.3d 1272, 1276 (Colo. App. 2010) (concluding that the parent had "waived his right to raise" a reasonable efforts argument on appeal because he "did not assert that the Department's efforts to rehabilitate and reunite the family were deficient" or "bring the matter to the D&N court's attention in any other way"); *see also People in Interest of A.L.B.*, 994 P.2d 476, 480 (Colo. App. 1999) (declining to address an appellate claim that "was not argued to the trial court at the conclusion of the evidentiary hearing"). We therefore decline to address the merits of her argument.

## V. Parenting Time

¶ 31 Mother also argues that the juvenile court erred by entering an APR that did not award her any parenting time. We disagree.

¶ 32 When allocating parental responsibilities in a dependency and neglect proceeding, the juvenile court must consider the legislative

purposes of the Children's Code under section 19-1-102, *People in Interest of C.M.*, 116 P.3d 1278, 1281 (Colo. App. 2005), and allocate parental responsibilities in accordance with the children's best interests, *L.A.G. v. People in Interest of A.A.G.*, 912 P.2d 1385, 1391 (Colo. 1996).

¶ 33    An APR is within the juvenile court's discretion and will not be disturbed on review if competent evidence supports the judgment. *See People in Interest of A.M.K.*, 68 P.3d 563, 565 (Colo. App. 2003). It is for the juvenile court, as the trier of fact, to determine the sufficiency, probative effect, and weight of the evidence, and to assess the credibility of witnesses. *People in Interest of A.J.L.*, 243 P.3d 244, 249-50 (Colo. 2010); *see also In re Parental Responsibilities Concerning B.R.D.*, 2012 COA 63, ¶ 15 (when there is record support for the court's findings, its resolution of conflicting evidence is binding on review). But whether the court applied the correct legal standard in making its findings is a question of law that we review de novo. *People in Interest of N.G.G.*, 2020 COA 6, ¶ 10.

¶ 34    In declining to allocate any parenting time to mother, the juvenile court primarily relied on the expert opinion of a therapist,

who worked with mother at CIP. Based on the therapist's opinions, the court found that mother "demonstrated different parenting styles dependent on her mood," and because of this instability, the children did not "trust" mother. For example, the therapist testified that, although mother had the capacity to parent, she was often "distracted" by her own issues and could not be "present" for the children. The therapist said that mother's "unpredictability create[d] a lot of anxiety and stress" for the children, and as a result, they could not trust her. Based on these observations, the therapist recommended that mother not have contact with the children because they would not be able "to grow and develop in the ways that are optimal for them" until they have a break from the "anxiety and stress" brought on by contact with mother.

¶ 35    The juvenile court also considered the caseworker's testimony agreeing with the therapist's position. The caseworker testified that mother should not have parenting time with the children, but if she did, it should be "very, very limited until she could demonstrate significant progress on her mental health," sobriety, and relationships with the kinship providers. The caseworker also testified that mother had the "capacity, but not the willingness, to

apply what she's learned in all of [her] therapies," and therefore the children needed a "pause" so mother could follow a "roadmap" to reestablish parenting time. Finally, the caseworker said that maintaining the current family time schedule — one supervised visit per week — would not provide the necessary "change" the children needed to assure permanency.

¶ 36 The juvenile court then weighed these opinions against the opinion of mother's visitation supervisor, who continued to recommend parenting time. The visitation supervisor testified that mother demonstrated fairly consistent attendance at visits, and the visitation supervisor never had to end a visit because of a safety issue. And she opined that mother should be allowed to have weekly parenting time in the community under the APR.

¶ 37 Finally, the juvenile court considered mother's relationship with the kinship providers. The court found that mother had "obliterated relationships between herself and the care providers, putting her own needs first at every turn." The court also found that mother's actions jeopardized the children's placements. For example, maternal great-aunt testified that, because of mother's actions, she could not keep the children in her home if the court

18

awarded mother parenting time.  Similarly, paternal grandmother testified that she would not be willing to keep the children in her home if the court forced her to have contact with mother, and she advocated against mother having parenting time.

¶ 38    Ultimately, after considering the therapist's and caseworker's expert opinions — weighed against the visitation supervisor's opinion — and considering mother's difficult relationship with the kinship providers, the juvenile court concluded that "no visits at all would be best for the children to free them from this conflict" and provide them with the "permanence, routine, structure, and overall well-being" that they needed.  *See A.J.L.*, 243 P.3d at 249-50; § 19-1-102(1)(c)-(d).  Because there is record support for the juvenile court's determination that withholding parenting time from mother was in the children's best interests, we may not disturb the court's judgment.  *See People in Interest of L.B.*, 254 P.3d 1203, 1208 (Colo. App. 2011).

¶ 39    We also reject mother's contention that the juvenile court erred by failing to provide her with the benefit of the *Troxel* presumption.  *See People in Interest of J.G.*, 2021 COA 47, ¶ 21 ("[I]n proceedings between a parent and nonparent, the parent is

19

entitled to a constitutional presumption that the parent acts in the child's best interests." (citing *Troxel v. Granville*, 530 U.S. 57, 68 (2000))). In dependency and neglect cases, an order adjudicating a child dependent or neglected deprives the unfit parent of a *Troxel* presumption, *People in Interest of N.G.*, 2012 COA 131, ¶ 33, but the presumption may be restored when a parent complies with the treatment plan during a case and demonstrates that they can safely parent the children, *see N.G.G.*, ¶ 2. If the parent is entitled to the *Troxel* presumption, it "can be rebutted only by findings based on clear and convincing evidence that the grant of parental responsibilities to the non-parent is in the child's best interests." *In re Parental Responsibilities Concerning B.J.*, 242 P.3d 1128, 1134 (Colo. 2010).

¶ 40    In support of her position, mother directs our attention to evidence showing that she complied with parts of her treatment plan, including evidence that she had stable housing, attended parenting time, participated in therapy, and complied with her probation sentence. But other evidence established that mother had not successfully complied with important components of her treatment plan, including substance use and mental health.

Because the juvenile court found that mother had not complied with her treatment plan and could not safely parent the children, she was not entitled to the *Troxel* presumption, and we cannot reweigh the evidence or substitute our judgment for that of the juvenile court to reach a different conclusion. *See People in Interest of K.L.W.*, 2021 COA 56, ¶ 62.

¶ 41 Finally, we reject mother's contention that the juvenile court misapplied the best interest factors in section 14-10-124, C.R.S. 2024, of the Uniform Dissolution of Marriage Act (UMDA). In a dependency and neglect case, the court *may* consider provisions of the UMDA, including the best interest factors in section 14-10-124, so long as the court's focus remains on the child's safety and protection and not on the parent's custodial interests. *People in Interest of H.K.W.*, 2017 COA 70, ¶ 13. Mother maintains that the factors in section 14-10-124 "weigh heavily" in favor of allowing her continued contact with the children. While we recognize that the court mentioned the factors in its recitation of the law, it is unclear to us whether it applied those factors, especially considering that it did not mention any of them in the remainder of its ruling. We

therefore reject mother's assertion because it would again require us to engage in factfinding.  *See S.Z.S.,* ¶ 21.

## VI.    Disposition

¶ 42     The judgment is affirmed.

JUDGE TOW and JUDGE PAWAR concur.