24CA0935 Peo in Interest of JLC 02-06-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 24CA0935
Larimer County District Court No. 23JV30009
Honorable Gregory M. Lammons, Judge

---

The People of the State of Colorado,

Appellee,

In the Interest of J.L.C., a Child,

and Concerning J.C., III and J.C.,

Appellants.

---

JUDGMENT AFFIRMED

Division VII
Opinion by JUDGE MOULTRIE
Lipinsky and Johnson, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced February 6, 2025

---

William G. Ressue, County Attorney, Arthur J. Spicciati, Assistant County Attorney, Fort Collins, Colorado, for Appellee

Josi McCauley, Guardian Ad Litem

Andrew A. Gargano, Office of Respondent Parents' Counsel, Denver, Colorado, for Appellant J.C., III

Just Law Group, LLC, John F. Poor, Denver, Colorado, for Appellant J.C.

¶ 1     J.C., III (father) and J.C. (mother) appeal the judgment terminating their parent-child legal relationships with J.L.C. (the child).  We affirm.[1]

## I.     Background

¶ 2     In January 2023, the Larimer County Department of Human Services (Department) filed a petition in dependency and neglect due to concerns that the child experienced a pulmonary hemorrhage at birth and needed to be resuscitated, and that mother admitted to daily fentanyl use during her pregnancy.  The child entered a neonatal intensive care unit, where she received intravenous fentanyl to combat withdrawal symptoms.  The Department also had concerns about father's substance use.

¶ 3     The parents failed to appear at their respective adjudication trials, and the juvenile court adjudicated the child dependent and

---

[1] The Larimer County Department of Human Services' answer brief purports to incorporate by reference the guardian ad litem's answer brief "in its entirety," except for father's argument that the juvenile court erred by denying his request for a continuance.  Similarly, mother's counsel filed a "Notice of Joinder in Father's First Issue on Appeal Relating to ICWA Compliance."  This practice violates C.A.R. 28(h).  *See Frisco Lot 3 LLC v. Giberson Ltd. P'ship, LLLP*, 2024 COA 125, ¶¶ 17-21.  The parties are placed on notice that this court may sanction future violations of this rule by striking a portion or all of a party's brief or imposing other sanctions, as appropriate.

neglected following bench trials. The court adopted treatment plans for the parents that required them to (1) address their substance abuse issues; (2) address their mental health concerns; (3) provide a safe and stable home and meet the child's needs; (4) communicate with the Department and professionals; (5) attend family time; and (6) refrain from criminal activity.

¶ 4    In November 2023, the Department moved to terminate the parents' parental rights. The juvenile court held an evidentiary hearing in April 2024. Following the hearing, the court entered a written ruling that granted the Department's motion and terminated the parent-child legal relationships between the parents and the child.

II.    Indian Child Welfare Act

¶ 5    Father first asserts that the juvenile court did not comply with the provisions of the Indian Child Welfare Act (ICWA) of 1978, 25 U.S.C. §§ 1901-1963, and Colorado's ICWA statute, § 19-1-126, C.R.S. 2024. Specifically, he contends that the court erred by failing to make proper inquiries and concluding that the Department had exercised due diligence under section 19-1-126(3). We disagree.

## A. Applicable Law and Standard of Review

¶ 6 For ICWA to apply in a dependency and neglect proceeding, the case must involve an Indian child. *See People in Interest of A.G.-G.*, 899 P.2d 319, 321 (Colo. App. 1995); *see also* 25 U.S.C. § 1903(4) (defining "Indian child" as "any unmarried person who is under age eighteen" and (1) "a member of an Indian tribe," or (2) "eligible for membership in an Indian tribe" and "the biological child of a member of an Indian tribe"). We review de novo whether the juvenile court complied with ICWA. *People in Interest of T.M.W.*, 208 P.3d 272, 274 (Colo. App. 2009).

¶ 7 To ascertain whether the case involves an Indian child, a juvenile court must inquire of the parties at the commencement of the proceeding whether they know or have reason to know that the child is an Indian child. § 19-1-126(1)(a)(I)(A). The court must make a new inquiry if a proceeding to terminate parental rights is initiated during a dependency and neglect case. C.R. ICWA P. 3(a), (c).

¶ 8 A mere assertion of Indian heritage, without more, is insufficient to give the juvenile court reason to know that the child is an Indian child. *People in Interest of E.A.M. v. D.R.M.*, 2022 CO

3

42, ¶ 56. If the court does not have reason to know but has information that "the child may have Indian heritage," then the court must direct the department to "exercise due diligence in gathering additional information that would assist the court in determining whether there is reason to know that the child is an Indian child." § 19-1-126(3); *see also H.J.B. v. People in Interest of A-J.A.B.*, 2023 CO 48, ¶ 5. Due diligence "requires the department to earnestly endeavor to investigate the basis for the parent or other participant's assertion that the child may be an Indian child." *H.J.B.*, ¶ 57.

¶ 9 Whether the department satisfied its due diligence obligation is left to the court's sound discretion. *Id.* at ¶ 58.

## B. Analysis

¶ 10 In March 2023, the Department sent ICWA notices to the eight federally recognized Apache tribes. The Department attached an affidavit from the caseworker, which stated that maternal grandmother had told the Department that "the family belong[ed] to the Chiricahua Apache [T]ribe in Colorado." However, maternal grandmother did not believe that anyone in the family was a registered member of a tribe. The Chiricahua Apache Tribe is not a

federally recognized tribe, but the parties agree that the Chiricahua Apaches' ancestors were members of three federally recognized tribes: Fort Sill Apache Tribe, Mescalero Apache Tribe, and San Carlos Apache Tribe. *See People in Interest of L.L.*, 2017 COA 38, ¶ 36 (noting that "ICWA applies only if the Tribe is a federally recognized Indian Tribe"), *overruled on other grounds by E.A.M.*, ¶ 56 n.10.

¶ 11 The record indicates that all eight federally recognized Apache tribes received the Department's notice. A few of the tribes indicated that the child was not a member of, or eligible for membership in, the tribe. However, the Mescalero Apache Tribe responded that mother or father (or possibly both) was a member of the Tribe. Yet, the Tribe indicated that the child was not eligible for membership in the Tribe. As pertinent to this appeal, the Fort Sill Apache Tribe and San Carlos Apache Tribe did not respond to the Department.

¶ 12 At a setting conference in early February 2024, the juvenile court noted that it had seen the letter from the Mescalero Apache Tribe stating that the child was not eligible. However, the court further noted that, in the motion to terminate, the Department had

listed "a different tribe." The court asked the county attorney to explain the "discrepancy." The county attorney said that he did not have any responsive information and would "look into it further."

¶ 13 Following the termination hearing, the juvenile court found that "sufficient inquiries have been made into the applicability of [ICWA], and [the child] has not been identified as an Indian Child for ICWA purposes."

¶ 14 On appeal, father asserts that the juvenile court failed to make proper inquiries of the parents because it did not ask them about ICWA until January 2024 and then only asked about "new information." However, neither parent appeared in court *until* January 2024, and as a result, the court could not have inquired of them previously. And although the court asked them whether they had "new information," instead of asking whether they had *any* information, we still discern no error. A court need not use "magic words" in inquiring about ICWA information. In this case, the Department already had information about the Apache tribes, so if the parents had *any* information about a different tribe, the parents had the opportunity to provide it at that hearing. But they indicated that they did not have any information.

6

¶ 15    Nor are we convinced that the juvenile court erred by determining that the Department had exercised due diligence under section 19-1-126(3).  Father maintains that the court directed the Department to make further due diligence efforts at the February 2024 hearing.  But the discussion at that hearing appears to relate to the court and the county attorney's confusion about whether information regarding the tribe listed in the motion to terminate — the Chiricahua Apache Tribe — was different information than that which had already been provided to the court.  Thus, we disagree with father's assertion.  Because the Chiricahua Apache Tribe is not a federally recognized tribe, the Department did not need to contact it to satisfy the Department's due diligence obligation.  *See E.A.M.*, ¶ 48.  And, in any event, the Department previously investigated the basis for father's assertion that the child might be an Indian child and provided the information it obtained to the federally recognized Apache tribes.

¶ 16    Finally, to the extent that father asserts that the Department needed to follow up with the Fort Sill Apache Tribe and the San Carlos Apache Tribe, we are also not persuaded.  Again, the Department contacted those tribes, but they did not respond.

Father does not direct us to any authority requiring the Department to do more to satisfy the requirements of section 19-1-126(3). *See H.J.B.*, ¶ 52 (noting that section 19-1-126(3) does not require a department of social services to provide notice to tribes as part of its due diligence efforts); *see also id.* at ¶ 55 (holding that due diligence "will necessarily vary with the specific circumstances of each case").

## III. Continuance

¶ 17 Father next contends that the juvenile court erred by denying his motion to continue. We disagree.

### A. Applicable Law and Standard of Review

¶ 18 The Colorado Children's Code directs courts to "proceed with all possible speed to a legal determination that will serve the best interests of the child." § 19-1-102(1)(c), C.R.S. 2024. Thus, when ruling on a motion to continue, the juvenile court "should balance the need for orderly and expeditious administration of justice against the facts underlying the motion and the child's need for permanency." *People in Interest of R.J.B.*, 2021 COA 4, ¶ 11.

¶ 19 In expedited permanency planning (EPP) cases where, as here, a child is under six years of age at the time the petition is filed, a juvenile court cannot grant a continuance unless the moving party

establishes (1) good cause for the continuance and (2) that the continuance will serve the child's best interests. § 19-3-104, C.R.S. 2024. If a court does grant a continuance under this section, then it must reschedule the matter within thirty days. *Id.*

¶ 20 We review the denial of a continuance motion for an abuse of discretion. *See C.S. v. People in Interest of I.S.*, 83 P.3d 627, 638 (Colo. 2004). We will not disturb the juvenile court's decision absent a showing that it was manifestly arbitrary, unreasonable, or unfair. *People in Interest of M.B.*, 2020 COA 13, ¶ 41.

## B. Analysis

¶ 21 As relevant here, the record shows that father was incarcerated in the county jail beginning in late March 2023. He was then transferred to the Denver-based diagnostic center for the Department of Corrections (DOC) for a few weeks before he was transferred to the Sterling Correctional Facility (prison) in July 2023. He was released from prison on April 26, 2024, three days before the termination hearing.

¶ 22 At a pretrial conference the day before father was released, the county attorney asked to continue the termination hearing for "a couple months" to "give [father] an opportunity to engage with the

Department and make some attempt at reunification." The county attorney also noted that, although the Department had made efforts to engage father, the prison facility had been a "roadblock." Father joined in the county attorney's request.

¶ 23 The guardian ad litem (GAL) objected to a continuance. The GAL noted that this was an EPP case based on the child's age and that the child needed permanency as soon as possible. *See, e.g.,* § 19-1-102(1.6) (noting that the EPP provisions require that a child be placed in a permanent home "as expeditiously as possible"). He further reported that the child was in a potentially permanent home and that she was "doing really well." Finally, the GAL stated that there had not been "any changes" during the case that would support "good cause to continue the proceeding," considering the child's need for permanency.

¶ 24 The juvenile court denied the request for a continuance. In doing so, the court noted that, in a "perfect world," we would have an opportunity for "full participation" by parents, but the court conceded that "we don't live in that world." The court then stated that the "interests of the child" had to "outweigh the request" at that time.

¶ 25    We perceive no abuse of discretion in the juvenile court's ruling.  *See C.S.*, 83 P.3d at 638.  The court properly weighed the need for orderly and expeditious administration of justice against the facts underlying the motion and the child's need for permanency.  *See R.J.B.*, ¶ 11.  The case had been open for more than a year, father had not made progress on his treatment plan during that time, the child was in a potentially permanent home that could provide for all her needs, and nothing in the record suggests that father could have become fit if he had been allowed a few more months to work on his treatment plan.  Under the statute, the court could only continue the hearing for thirty days and nothing suggests that, even if father immediately began to comply with his treatment plan upon his release from prison, he could become fit within thirty days.  *See* § 19-3-104.  Finally, as discussed below, even though the Department had difficulties in providing services to father in prison, the Department's challenges did not amount to a lack of reasonable efforts.

¶ 26    Father also asserts that the juvenile court erred by applying Chief Justice Directive 96-08, Directive Concerning the Processing of Dependency and Neglect Cases, § 4 (Dec. 1996) (CJD 96-08),

11

which provides that a continuance can be granted "only upon a finding that a manifest injustice would occur in the absence of a continuance." Specifically, he maintains that CJD 96-08 conflicts with the standard in section 19-3-104. Although the GAL referenced CJD 96-08 in his argument, it was repealed on September 8, 2023 and, therefore, did not apply in this case. We see nothing in the court's ruling to suggest that it relied on CJD 96-08 when it denied the continuance, and we therefore discern no error.

¶ 27 Finally, father did not assert in the juvenile court that a denial of the continuance would violate his due process rights, and we therefore decline to address that contention. *See M.B.*, ¶ 14 (in dependency and neglect cases, appellate courts do not address issues raised for the first time on appeal); *see also Forgette v. People*, 2023 CO 4, ¶ 21 (noting that, although a party need not use "talismanic language" to preserve an issue for appeal, a party must still present the court with an adequate opportunity to make findings of fact and conclusions of law on the specific issue raised on appeal); *People v. Tallent*, 2021 CO 68, ¶ 11 ("[A]n appellate court has an independent, affirmative duty to determine whether a

12

claim is preserved . . . , regardless of the positions taken by the parties.").

## IV. Termination Criteria

¶ 28 Father also argues, for the three reasons discussed below, that the juvenile court erred by concluding that the Department had proved the termination criteria by clear and convincing evidence. We disagree.

### A. Termination Criteria and Standard of Review

¶ 29 The juvenile court may terminate parental rights if it finds, by clear and convincing evidence, that (1) the child was adjudicated dependent and neglected; (2) the parent has not complied with an appropriate, court-approved treatment plan or the plan has not been successful; (3) the parent is unfit; and (4) the parent's conduct or condition is unlikely to change in a reasonable time. § 19-3-604(1)(c), C.R.S. 2024.

¶ 30 Whether the juvenile court properly terminated parental rights is a mixed question of fact and law. *People in Interest of A.M. v. T.M.*, 2021 CO 14, ¶ 15; *see also People in Interest of A.S.L.*, 2022 COA 146, ¶ 8 (applying the same standard of review to whether a department of human services satisfied its obligation to make

reasonable efforts). We review the court's factual findings for clear error, but we review de novo its legal conclusions based on those facts. *People in Interest of S.R.N.J-S.*, 2020 COA 12, ¶ 10.

## B. Treatment Plan

¶ 31    Father asserts that (1) his treatment plan was inappropriate; and (2) to the extent that it was appropriate, he reasonably complied with it. We disagree.

### 1. Applicable Law

¶ 32    The purpose of a treatment plan is to preserve the parent-child legal relationship by assisting the parent in overcoming the problems that required the government's intervention. *K.D. v. People*, 139 P.3d 695, 699 (Colo. 2006). A treatment plan is appropriate if it is reasonably calculated to render the parent fit to provide adequate parenting to the child within a reasonable time and relates to the child's needs. § 19-1-103(12), C.R.S. 2024.

¶ 33    We measure the appropriateness of a treatment plan by its likelihood of success in reuniting the family, "which must be assessed in light of the facts existing at the time of the plan's approval." *People in Interest of B.C.*, 122 P.3d 1067, 1071 (Colo. App. 2005). As relevant here, a parent's incarceration does not

14

"prohibit the creation and implementation" of an appropriate treatment plan, but it may "render more difficult the crafting of a meaningful and workable plan." *People in Interest of M.C.C.*, 641 P.2d 306, 309 (Colo. App. 1982) (noting additional considerations for the court, such as the length of the parent's incarceration and nature of the criminal conduct, when approving a treatment plan for an incarcerated parent).

¶ 34    In an EPP case, the juvenile court cannot find that a parent successfully complied with a treatment plan when the parent (1) has not attended family time unless good cause can be shown or (2) exhibits the same problems addressed in the treatment plan without adequate improvement. § 19-3-604(1)(c)(I). Although absolute compliance with a treatment plan is not required, even substantial compliance may not be sufficient to correct or improve the parent's conduct or condition, or to render the parent fit. *People in Interest of T.E.M.*, 124 P.3d 905, 909 (Colo. App. 2005).

## 2.    Analysis

¶ 35    Recall that father's treatment plan addressed six areas: substance abuse, mental health, stability to meet the child's needs, communication, family time, and criminal activity. Father is correct

that, even though he was incarcerated during most of the case, the treatment plan that the juvenile court adopted did not include anything specifically related to the services available to him in the county jail or prison. Accordingly, father asserts on appeal that his treatment plan was inappropriate because it did not provide him with a pathway to rehabilitation while he remained incarcerated.

¶ 36 We start by noting that father has not asserted that any of the six main objectives in his treatment plan were unnecessary or that the treatment plan should have addressed something else. *See People in Interest of K.B.*, 2016 COA 21, ¶¶ 22-23 (directing the juvenile court to consider, on remand, whether the parent's treatment plan was inappropriate because it did not include a component addressing domestic violence). Said another way, it is undisputed that father needed to address these six areas for him to become a fit parent.

¶ 37 Nonetheless, we recognize that father could not complete some of the action steps listed under each of the objectives while he was incarcerated. For example, because the Department could not provide referrals for assessments while father was incarcerated, he could not complete those steps while he remained in jail or prison.

16

However, we disagree with father that this necessarily rendered the treatment plan inappropriate because he has not explained how he could have addressed the safety concerns identified in this case without completing the action steps listed in the treatment plan. *See People in Interest of M.M.*, 726 P.2d 1108, 1121-22 (Colo. 1986) ("[I]n many cases[,] it is virtually impossible to devise a plan which will guarantee success."). Indeed, father does not explain how the treatment plan could have been amended to address his concerns but still been able to render him a fit parent in a reasonable time. We therefore conclude that the juvenile court did not err by finding that father's treatment plan was appropriate.

¶ 38 Nor are we convinced by father's alternative argument that he reasonably complied with his treatment plan. In support, father directs our attention to evidence that he was sober and desired to stay sober, attended some classes in prison, was employed following his release from prison, met with the caseworker and attended some family team meetings and court hearings, and did not receive additional criminal charges after the treatment plan was adopted. But the caseworker testified that father had not demonstrated that he could maintain his sobriety outside of a controlled environment.

She also explained that she observed father falling asleep during the termination hearing. We acknowledge that father said he was resting his eyes, but regardless, the juvenile court further noted that father's testimony was "extremely rapid and unintelligible." Additionally, the caseworker said that father did not complete a mental health assessment, have a stable home, provide for the child's needs, or attend family time. Therefore, the caseworker opined that father had not successfully complied with his treatment plan.

¶ 39 Therefore, although some evidence supports father's argument that he reasonably complied with his treatment plan, other evidence shows that father did not successfully comply with the treatment to render him a fit parent. *See T.E.M.*, 124 P.3d at 909 (noting that, although the parent attempted to comply with several components of the treatment plan, he had not addressed some of the most significant issues that brought the case before the court). We cannot reweigh the evidence or substitute our judgment to reach a different conclusion. *See People in Interest of S.Z.S.*, 2022 COA 133, ¶ 29. We therefore reject father's contention.

¶ 40    Finally, we are not persuaded by father's assertion that we must reverse the judgment because the juvenile court considered evidence of father's noncompliance before the treatment plan was adopted.  Nothing indicates that the court exclusively relied upon this evidence when it found that father had failed to comply with the treatment plan.  Though the court considered information concerning father's level of engagement with the services the Department offered him before his treatment plan was adopted, the court also considered father's level of engagement after the treatment plan was adopted — including father's testimony that he had completed classes while incarcerated.  We therefore discern no error.

## C.    Fitness Within a Reasonable Time

¶ 41    Father contends that the juvenile court erred by determining that he was unfit, or in the alternative, if he was unfit, that he could not become fit in a reasonable time.  We disagree.

### 1.    Applicable Law

¶ 42    An unfit parent is one whose conduct or condition renders the parent unable or unwilling to give a child reasonable parental care. *People in Interest of D.P.,* 160 P.3d 351, 353 (Colo. App. 2007).

19

Reasonable parental care requires, at a minimum, that the parent provide nurturing and safe parenting sufficiently adequate to meet the child's physical, emotional, and mental needs and conditions. *People in Interest of A.J.*, 143 P.3d 1143, 1152 (Colo. App. 2006). A parent's noncompliance with a treatment plan generally "demonstrates a lack of commitment to meeting the child's needs and, therefore, may also be considered in determining unfitness." *People in Interest of D.P.*, 181 P.3d 403, 408 (Colo. App. 2008).

¶ 43 When determining whether a parent's conduct or condition is likely to change in a reasonable time, the juvenile court may consider whether any change has occurred during the proceeding, the parent's social history, and the chronic or long-term nature of the parent's conduct or condition. *People in Interest of D.L.C.*, 70 P.3d 584, 588-89 (Colo. App. 2003). Where a parent has made little to no progress on a treatment plan, the court need not give the parent additional time to comply. *See People in Interest of R.B.S.*, 717 P.2d 1004, 1006 (Colo. App. 1986).

¶ 44 The determination of a reasonable period is fact-specific and varies from case to case. *People in Interest of D.Y.*, 176 P.3d 874, 876 (Colo. App. 2007); *see also S.Z.S.*, ¶ 24. However, a reasonable

time is not an indefinite time, and it must be determined by considering the child's physical, mental, and emotional conditions and needs. *S.Z.S.*, ¶ 24. As in this case, when a child is under six years old, the juvenile court must also consider the EPP provisions, which require that the child be placed in a permanent home as expeditiously as possible. *See* §§ 19-1-102(1.6), 19-1-123, 19-3-702(5)(c), C.R.S. 2024.

### 2. Analysis

¶ 45  Father asserts that the juvenile court erred because it improperly based its fitness finding on his incarceration. *See K.D.,* 139 P.3d at 700-01 (noting that a court may consider parental incarceration, so long as it does not base its termination decision on the parent's incarcerated status alone). In this case, the court found, with record support, that father did not successfully comply with the treatment plan, did not have a permanent home for the child, was "addicted to drugs for most of his life," did not demonstrate that he could maintain his sobriety in the community, and had not successfully parented any of his other children (his parental rights to at least one other child had been terminated). *See* § 19-3-604(2) (listing factors that a court may consider in

21

determining whether a parent is unfit, including whether a parent's parental rights had previously been terminated); *see also D.P.*, 181 P.3d at 408. Therefore, although the record shows that father's incarceration during the case informed the court's decision, it was not the sole reason that it found him unfit. *See K.D.*, 139 P.3d at 703 (The court did not err when it "carefully considered how [the parent's] continued incarceration affected his fitness and his corresponding ability to meet [the child's] needs within a reasonable time."). We therefore discern no error.

¶ 46 Father also contends that the evidence did not support the juvenile court's findings that he was unfit or, in the alternative, he could not become fit in a reasonable time. For example, father points to evidence that he maintained contact with the caseworker, took as many classes as he could, avoided disciplinary action inside the prison, and stayed sober. He further asserts that, once he was released from prison, he had employment and only needed ninety days to get "his ducks in a row." But, as described above, evidence in the record supports the court's findings. Consequently, we decline father's invitation to reweigh the evidence to reach a different conclusion. *See S.Z.S.*, ¶ 29.

## D.  Reasonable Efforts

¶ 47    Father argues that the Department failed to make reasonable efforts to rehabilitate him and reunify him with the child.  We disagree.

### 1.  Applicable Law

¶ 48    Before a juvenile court may find a parent unfit, the county department of human services must make reasonable efforts to rehabilitate the parent and reunite the family.  §§ 19-1-103(114), 19-3-100.5(1), 19-3-208, 19-3-604(2)(h), C.R.S. 2024.  Reasonable efforts means the "exercise of diligence and care" to reunify parents with their children.  § 19-1-103(114).

¶ 49    Services provided in accordance with section 19-3-208 satisfy the reasonable efforts standard.  § 19-1-103(114).  Among the services required under section 19-3-208 are screenings, assessments, and individual case plans for the provision of services; home-based family and crisis counseling; information and referral services to available public and private assistance resources; family time; and placement services.  § 19-3-208(2)(b).

¶ 50    The juvenile court should consider whether the services provided were appropriate to support the parent's treatment plan,

23

*People in Interest of S.N-V.*, 300 P.3d 911, 915 (Colo. App. 2011), by "considering the totality of the circumstances and accounting for all services and resources provided to a parent to ensure the completion of the entire treatment plan," *People in Interest of My.K.M. v. V.K.L.*, 2022 CO 35, ¶ 33.

### 2. Analysis

¶ 51 Father first asserts that the Department failed to make reasonable efforts to provide him with a copy of the treatment plan. The caseworker admitted that she did not give father a copy of the treatment plan, and best practices presumably require that caseworkers provide parents with copies of their treatment plans. But father has not directed us to anything in section 19-3-208 that requires it. And because father was represented by counsel while he was incarcerated, he could have acquired the treatment plan through other means if he needed it. And nothing in the record suggests that father failed to comply with his treatment plan because he did not know what was in it, or that having a written copy of it would have facilitated his compliance.

¶ 52    Father next contends the Department did not make reasonable efforts because it did not provide him with services while he was incarcerated.  We are not convinced.

¶ 53    The record shows that the caseworker met with father at the county jail three times before he was transferred to the DOC.  The caseworker said that the Department attempted to provide family time for father while he was in the jail, but either the jail or agency that accepted the Department's family time referral ultimately could not accommodate in person visits and father was transferred to the DOC before any video visits could be arranged.

¶ 54    Once father was transferred to the DOC, the prison informed the caseworker that the DOC only allows "the person who holds custody" to supervise a parent's family time.  The caseworker reported that conversations were "ongoing" to determine how family time could occur.  The caseworker also said that she attempted to schedule family time for father seven or eight times, but that the prison did not always respond to her and, therefore, she did not get "anywhere."  The placement provider was willing to facilitate virtual family time, and eventually the prison told the caseworker that it could not accommodate any family time until at least April 2024.

¶ 55 The caseworker opined that substance abuse was the "biggest barrier" to father's ability to provide for the child's needs. The caseworker also testified that she contacted a coordinator at the jail to inquire about services, and father said that he was able to engage in a class offered at the jail. The caseworker encouraged father to provide her with any treatment certificates he had received, and father also agreed to sign a release of information to allow the caseworker to obtain information about the classes he had completed. The record shows that the caseworker visited father at the prison and discussed programming with him; father told the caseworker that he had gotten into a few classes, but other classes had very long wait lists. The caseworker said that father did not need a referral from the Department to participate in any of the programs offered through the DOC.

¶ 56 Based on this record, the juvenile court found that the Department had made reasonable efforts for father while he was incarcerated. Specifically, the court noted that the caseworker had attempted to contact personnel at the prison, but "the prison was not cooperative" and the Department had no authority over the DOC to get it to comply with its requests. Therefore, the record

shows that the Department made reasonable efforts for father while he was incarcerated, but the DOC's noncooperation, not the Department's lack of efforts, prevented father from accessing additional services. Because the record supports the court's findings, we cannot disturb them.

¶ 57    For two reasons, we are not otherwise convinced that the Department failed to make reasonable efforts for father after the General Assembly enacted new laws addressing incarcerated parents in dependency and neglect cases in January 2024. Section 19-3-507(1)(f)(I), C.R.S. 2024, now provides that, "prior to any dispositional hearing," the department must make reasonable efforts to involve the parent in "planning the services for the child," including "[o]pportunities for meaningful family time." Likewise, section 19-3-508(1)(e)(III), C.R.S. 2024, states that "[i]f, after the dispositional hearing, the child's parent becomes continuously incarcerated in a department of corrections facility," the caseworker "shall provide information that details the services and treatment available to a parent" or "the caseworker's efforts to obtain the information."

¶ 58    First, the amendments to section 19-3-507(1)(f) do not apply in this case.  This statute addresses what the Department must do to plan services with a parent *before* the dispositional hearing, but the dispositional hearing in this case occurred before the amendment went into effect.  *See City of Golden v. Parker*, 138 P.3d 285, 290 (Colo. 2006) (noting that legislation is presumed to operate prospectively absent legislative intent to the contrary).  Thus, the Department did not have any additional duties under section 19-3-507(1)(f).

¶ 59    Second, we are not convinced that section 19-3-508(1)(e)(III) necessarily expands the Department's reasonable efforts requirement.  Section 19-3-508(1)(e)(III) requires the caseworker to investigate the services and treatment available at the prison or detail the efforts to obtain that information.  And, as stated above, the record shows that the caseworker attempted to contact individuals at the prison with little success.  It also shows that the caseworker met with father to discuss the services available at the facility.  The caseworker documented these efforts in her reports to the juvenile court.  Therefore, the caseworker complied with section 19-3-508(1)(e)(III).

## V. Less Drastic Alternatives

¶ 60 Mother asserts that the juvenile court erred by finding that there was no less drastic alternative to termination. Specifically, she contends that there were two less drastic alternatives to termination: (1) an allocation of parental responsibilities (APR) or (2) giving her more time to comply with her treatment plan. For the reasons described below, we disagree.

### A. Applicable Law and Standard of Review

¶ 61 Before terminating parental rights under section 19-3-604(1)(c), the juvenile court must also consider and eliminate less drastic alternatives. *M.M.*, 726 P.2d at 1122. In considering less drastic alternatives, a court must give primary consideration to the child's physical, mental, and emotional conditions and needs. § 19-3-604(3). In doing so, the court may consider, among other things, whether (1) an ongoing relationship between the parent and child would be beneficial, *People in Interest of A.R.*, 2012 COA 195M, ¶ 38; (2) an APR provides adequate permanence and stability for the child, *T.E.M.*, 124 P.3d at 910-11; and (3) the placement prefers adoption over an APR, *S.N-V.*, 300 P.3d at 920.

¶ 62    For a less drastic alternative to be viable, it must do more than "adequately" meet a child's needs; rather, it must be in the child's best interests. *A.M.*, ¶ 27. Therefore, if the juvenile court considers a less drastic alternative but finds instead that termination is in the child's best interests, it must reject the less drastic alternative and order termination. *Id.* at ¶ 32. And under those circumstances, we must affirm the court's decision if its findings are supported by the record. *People in Interest of B.H.*, 2021 CO 39, ¶ 81.

## B.    Analysis

¶ 63    The juvenile court found that there was no less drastic alternative to termination. The record supports this finding. It is undisputed that the child was born exposed to fentanyl, and mother admitted to the caseworker that she used fifty fentanyl pills a day before the child was born. Mother told the caseworker that she wanted to engage in inpatient treatment when she was released from jail, but after mother's release, the caseworker never heard from her again. The record also shows that mother did not complete a mental health assessment or participate in treatment and only saw the child twice during the pendency of the case. The caseworker opined that, because of the child's young age, she

needed permanency that could only be achieved through adoption. She also noted that the kinship placement wanted to adopt the child.

¶ 64     In sum, the evidence established that mother had done nothing to address the Department's concerns regarding the child's safety or become a fit parent.  It also shows that mother had no relationship with the child and that the child needed permanency as soon as possible.  In other words, the record establishes that an ongoing relationship with mother would not be beneficial for the child, *A.R.*, ¶ 38, and the child needed the permanency that only termination and adoption could provide, *T.E.M.*, 124 P.3d at 910-11.

¶ 65     The evidence also established that the current placement wanted to adopt the child.  *See S.N-V.*, 300 P.3d at 920.  In contrast, no evidence suggests that the current placement would accept an APR.  *See People in Interest of P.D.*, 580 P.2d 836, 838 (Colo. App. 1978) (noting that a court cannot enter an APR to an unwilling party who is not the child's parent).

¶ 66     Therefore, because the record supports the juvenile court's determination that termination, not a less drastic alternative, was

in the child's best interests, we cannot disturb its decision. *See B.H.*, ¶ 81; *A.M.*, ¶¶ 32, 49.

¶ 67    Mother also asserts that there was a less drastic alternative in the form of extending the case and giving her more time. But we disagree that this proposed resolution is properly characterized as a less drastic alternative to termination. The less drastic alternative analysis turns on whether there is a permanent or long-term placement arrangement — such as an APR — that would *conclude* the dependency and neglect proceeding without terminating parental rights. Mother instead asks to continue the proceeding.

¶ 68    Even though mother characterizes her argument as a challenge to the juvenile court's less drastic alternatives finding, we will construe it as a challenge to whether her conduct or condition was likely to change in a reasonable time, *see* § 19-3-604(1)(c)(III), and address that contention next.

¶ 69    As noted above, mother did not make any progress on her treatment plan during the case, had very little contact with the child, and had not had any contact with the caseworker for several months. *See R.B.S.*, 717 P.2d at 1006. The evidence also established that mother had a long history of substance abuse,

which she had been unable to address with any success in the past. *See D.L.C.*, 70 P.3d at 588-89.  Based on this evidence the caseworker opined that mother was unlikely to become fit within a reasonable time for this child.

¶ 70　　The juvenile court then found, with record support, that mother's conduct or condition was unlikely to change within a reasonable time.  Mother does not contest the factual findings or direct us to any contrary evidence.  Because the record supports the court's determination that mother's conduct or condition was unlikely to change in a reasonable time, we cannot disturb its judgment.  *See S.Z.S.*, ¶ 29.

## VI.　　Disposition

¶ 71　　The judgment is affirmed.

JUDGE LIPINSKY and JUDGE JOHNSON concur.