24CA0969 Peo in Interest of LA 06-05-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 24CA0969
Jefferson County District Court No. 22JV30121
Honorable Ann Gail Meinster, Judge

The People of the State of Colorado,

Appellee,

In the Interest of L.A., N.G., and D.A., Children,

and Concerning M.A. and D.G.,

Appellants.

JUDGMENT AFFIRMED

Division VI
Opinion by JUDGE KUHN
Welling and Schutz, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced June 5, 2025

Kimberly Sorrells, County Attorney, Claire M. Czajkowski, Assistant County Attorney, Golden, Colorado, for Appellee

Jeffrey C. Koy, Jordan Oates, and Lauren Dingboom, Guardians Ad Litem

The Morgan Law Office, Kristofr P. Morgan, Colorado Springs, Colorado, for Appellant M.A.

Beth Padilla, Office of Respondent Parents' Counsel, Durango, Colorado, for Appellant D.G.

¶ 1    In this dependency and neglect proceeding, M.A. (mother) and D.G. (father) appeal the juvenile court's judgment terminating their parent-child legal relationships with their children. We affirm the judgment.

## I.    Background

¶ 2    The Jefferson County Division of Children, Youth and Families filed a petition in dependency and neglect regarding ten-year-old D.A., four-year-old N.G., and two-year-old L.A. (the children). The petition alleged concerns about neglect and the condition of the home. The petition also alleged that father was incarcerated.

¶ 3    The Division placed the children together in a foster home where they remained throughout the proceeding. However, the foster home was not a permanent placement option.

¶ 4    The juvenile court adjudicated the children dependent and neglected. The court adopted a treatment plan for mother requiring that she, among other things, (1) complete a psychological evaluation and engage in recommended treatment; (2) attend a parenting class; (3) maintain a safe and stable living environment; and (4) regularly attend family time. Father's treatment plan required that he, among other things, (1) participate in any

recommended therapeutic or behavioral services; (2) maintain a safe and stable home; (3) attend a parenting class; (4) regularly participate in family time; and (5) comply with his parole and refrain from further criminal activity. Father's treatment plan was later amended to include a requirement that he complete a substance use assessment and treatment, if recommended.

¶ 5 The Division later moved to terminate mother's and father's parental rights. The court held a three-day hearing over the course of two months and, ultimately, terminated the parent-child legal relationships between the parents and the children.

## II. Analysis

¶ 6 Father contends that the juvenile court erred by violating the Indian Child Welfare Act (ICWA) of 1978, 25 U.S.C. §§ 1901-1963. Father and mother also jointly contend that the juvenile court erred by concluding that the Division made reasonable efforts to rehabilitate them and by concluding that there was no less drastic alternative to termination. We address these issues in turn.

### A. ICWA

¶ 7 Father asserts that the juvenile court violated ICWA's notice provisions. However, father does not assert anything more than a

mere assertion of heritage, and the record does not establish that the court had reason to know the children were "Indian children." Thus, we perceive no error.

### 1. Applicable Law and Standard of Review

¶ 8 Under ICWA, when the court "knows or has reason to know" that a child who is the subject of a dependency and neglect proceeding is an "Indian child," it has an obligation to ensure that the Division gives notice of the proceeding to any identified tribes. 25 U.S.C. § 1912(a); *see also* 25 U.S.C. § 1903(4) (defining "Indian child" as "any unmarried person who is under age eighteen" and who is either (1) "a member of an Indian tribe" or (2) "eligible for membership in an Indian tribe" and "the biological child of a member of an Indian tribe"). However, a mere assertion of Native American heritage, without more, is insufficient to give the juvenile court reason to know that the child is an "Indian child." *People in Interest of E.A.M. v. D.R.M.*, 2022 CO 42, ¶ 56.

¶ 9 We review de novo whether the juvenile court complied with ICWA. *People in Interest of T.M.W.*, 208 P.3d 272, 274 (Colo. App. 2009).

## 2. The Juvenile Court Did Not Violate ICWA's Notice Provisions

¶ 10 Mother submitted an affidavit indicating Navajo heritage and father's affidavit indicated Apache heritage. The Division sent notice to the tribes affiliated with the Navajo and Apache tribal ancestral groups. Most of the tribes responded that the children were not enrolled or eligible to enroll.

¶ 11 A few weeks before the termination hearing began, maternal grandmother moved to intervene. In her motion she noted that the children are either Navajo or "Leguna." When the juvenile court granted maternal grandmother's motion, it also asked her about Native American heritage. Grandmother responded, "I do believe they have Native American heritage, we just don't know what tribe." The court then asked if she had any new information that "we haven't already looked into" and maternal grandmother responded, "not at this time."

¶ 12 On appeal, father argues that the juvenile court did not comply with ICWA because it did not send notice to the Pueblo of Laguna, a federally recognized tribe located in New Mexico. But maternal grandmother's statements in her motion to intervene and

at the hearing amount to, at most, a mere assertion of heritage, which, standing alone, does not trigger a requirement to send notice. *See E.A.M.,* ¶ 56.

¶ 13    Moreover, during the briefing in this case, the Division filed ICWA notices with the juvenile court showing that it sent notice to the Pueblo of Laguna.[1]  About a month later, the Division filed responses from the tribe showing that none of the children were eligible for tribal membership.

¶ 14    Accordingly, we cannot conclude that the juvenile court erred when it found that it did not know or have reason to know the children were "Indian children" and when it did not direct the Division to send notice to the Pueblo of Laguna tribe.[2]

---

[1] The Division filed a motion to supplement the record, which was deferred to this division.  Given that this case is now at issue, we take judicial notice of these filings in the juvenile court.  *See People v. Sa'ra,* 117 P.3d 51, 55-56 (Colo. App. 2004) ("A court may take judicial notice of the contents of court records in a related proceeding.").  Accordingly, we deny the Division's motion as moot.

[2] Even if the court had erred, the tribe's responses showing that the children were not eligible for membership would render any such error harmless.  *See People in Interest of R.D.,* 2012 COA 35, ¶ 25 ("[E]rror in a civil case is harmless if id did not affect a substantial right of a party.").

### B. Father's Request For a Continuance

¶ 15    Father also asserts that the juvenile court erred when it denied his request for a continuance. We are not persuaded.

### 1. Applicable Law and Standard of Review

¶ 16    The Colorado Children's Code directs courts to "proceed with all possible speed to a legal determination that will serve the best interests of the child." § 19-1-102(1)(c), C.R.S. 2024. Thus, when ruling on a motion to continue, the juvenile court "should balance the need for orderly and expeditious administration of justice against the facts underlying the motion and the child's need for permanency." *People in Interest of R.J.B.*, 2021 COA 4, ¶ 11.

¶ 17    The expedited permanency planning (EPP) provisions of the Children's Code, which apply in any case where, as here, at least one of the subject children is under six years of age at the time the petition is filed, provide that a juvenile court cannot grant a continuance unless the moving party establishes (1) good cause for the continuance and (2) that the continuance will serve the child's best interests. § 19-3-104, C.R.S. 2024. If a court does grant a continuance under this section, then it must reschedule the matter within thirty days. *Id.*

¶ 18    We review the denial of a continuance motion for an abuse of

discretion.  *See C.S. v. People in Interest of I.S.*, 83 P.3d 627, 638

(Colo. 2004).  We will not disturb the juvenile court's decision

absent a showing that it was manifestly arbitrary, unreasonable,

unfair, or based on a misapplication of the law.  *People in Interest of*

*M.B.*, 2020 COA 13, ¶ 41.

## 2.    The Juvenile Court Did Not Abuse Its Discretion By Denying Father's Motion

¶ 19    Prior to the termination hearing, father requested a

continuance because he received the Division's response to his

discovery request late and that response consisted of thousands of

pages.  The juvenile court denied the requested continuance noting

that the EPP provisions applied, that it would have to reset within

thirty days, which it could not do because of counsel's scheduling

conflicts, and that it could not find good cause or that a

continuance would be in the children's best interests.

¶ 20    Father renewed his motion for a continuance on the first day

of the termination hearing arguing that his counsel had not had

time to review discovery and that he had just received the results of

mother's psychological and neuropsychological evaluation that morning.

¶ 21 The juvenile court denied father's motion but delayed the start of the hearing until the afternoon, allowed father's counsel to meet with the therapist who conducted mother's evaluations, added an additional hearing day several weeks later, and informed father's attorney that if, after the close of evidence, she still needed more time it would "entertain a request."

¶ 22 We perceive no abuse of discretion in the juvenile court's rulings. *See C.S.*, 83 P.3d at 638. The court properly weighed the need for orderly and expeditious administration of justice against the facts underlying the motions and the children's need for permanency. *R.J.B.,* ¶ 11. The case had been open for nearly two years, the juvenile court allowed father time to prepare for testimony about mother's psychological and neuropsychological evaluations, and the court informed father that, by the close of evidence, if he still needed additional time, he could ask. The termination hearing spanned two months and, at the close of evidence, father did not ask for additional time.

¶ 23    Father asserts on appeal that because his counsel did not have sufficient time to review discovery responses, his due process rights were violated when his counsel "did not have an opportunity to call witnesses and engage in cross examination." But he does not explain what witnesses he would have called, what expert witnesses he would have retained, or how their testimony might have changed the outcome of the proceeding. Nor does he explain why he was not able to identify the necessary witnesses in the two months between when the court denied his motion to continue and its ruling on the motion to terminate or why counsel did not ask for additional time at the close of evidence. *See People in Interest of R.J.B.*, 2021 COA 4, ¶ 35. Counsel's decision not to request additional time at the close of evidence belies any contention that he was prejudiced by the court's denial of his initial request for a continuance. Accordingly, the court's denial of a continuance was not an abuse of discretion.

## C.    Reasonable Efforts

¶ 24    Mother and father both argue that the juvenile court erred when it found the Division made reasonable efforts to rehabilitate them and reunify the family. We disagree.

9

### 1.  Applicable Law and Standard of Review

¶ 25    When a court decides whether parents are unfit or whether their conduct or condition will change, the court must evaluate whether the Division's reasonable efforts have been unable to rehabilitate them.  § 19-3-604(2)(h), C.R.S. 2024; *People in Interest of S.N-V.*, 300 P.3d 911, 915 (Colo. App. 2011).  "'Reasonable efforts' . . . means the exercise of diligence and care . . . for children and youth who are in . . . out-of-home placement . . . ." § 19-1-103(114), C.R.S. 2024.

¶ 26    The Division makes reasonable efforts if appropriate services are provided in accordance with section 19-3-208, C.R.S. 2024. *See People in Interest of J.A.S.*, 160 P.3d 257, 262 (Colo. App. 2007). Such reasonable efforts include screening, assessments, home-based family and crisis counseling, information and referral services to available public and private assistance resources, family time services for parents with children in out-of-home placement, and placement services including foster care and emergency shelter. § 19-3-208(2)(b).  Additional services should be made available if they are determined to be necessary and appropriate by the case plan and adequate funding exists.  § 19-3-208(2)(d).  Examples of

these additional efforts include providing transportation to required services when other transportation is not available, mental health services, and drug and alcohol treatment services. *Id.* Moreover, services provided by the Division must comply with the provisions of the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. §§ 12101-12134, and its related amendments and implementing regulations. § 19-3-208(2)(g).

¶ 27 Whether the Division satisfied its obligation to make reasonable efforts is a mixed question of fact and law. *People in Interest of A.S.L.*, 2022 COA 146, ¶ 8. We review the juvenile court's factual findings for clear error but review de novo its legal determination that the Division made reasonable efforts to rehabilitate a parent. *Id.*

### 2. Father's Contentions

¶ 28 Father argues that the Division did not make reasonable efforts because it did not arrange family time or provide "court ordered services" while he was incarcerated.

¶ 29 Father was incarcerated from the beginning of the case until November of 2022 and again from September 2023 until the entry of the termination order in April 2024.

11

¶ 30    The record establishes the following:

- During father's initial time in prison, his paternity was in question and family time was not started.

- Once father was released from prison and he was adjudicated the children's legal father, the Division provided an assessment with family intervention services.

- After father's release, the caseworker supervised several visits between him and the children until a third party was available to supervise family time.

- Father participated in family time for another few months but stopped visiting the children in July 2023.

- After father was reincarcerated the caseworker submitted a referral, and the family intervention services therapist sent letters to father attempting to schedule an intake appointment.

- The Division could not arrange virtual visits while father was incarcerated in Arapahoe County because the visitation form required disclosure of personal information about the caseworker.  The caseworker "tried phone calls" but was not able to arrange them.

- While father was in the Jefferson County jail, the family intervention services therapist was able to meet with him in person.

- While father was in Arrowhead Correctional Facility, the caseworker met with him and attempted to contact his case manager several times about family time options but was unable to make contact.

¶ 31     In sum, the record indicates that the Division attempted to provide father with family time services throughout the case and that any lack of services was attributable to either father's or the facilities' noncooperation.  *See People in Interest of A.V.*, 2012 COA 210, ¶ 12 (court may consider a parent's unwillingness to participate in treatment as a factor when considering reasonable efforts).

¶ 32     We are not persuaded to reach a different conclusion based on provisions in the recently enacted S.B. 23-039.  For example, the bill added section 19-3-507(1)(f)(I)(B), C.R.S. 2024, which now requires a department of human services to provide "[o]pportunities for meaningful family time between" children and incarcerated parents.  Ch. 191, sec. 5, § 19-3-507(1)(f)(I)(B), 2023 Colo. Sess.

Laws 955. The statute also requires a department to communicate with a facility to ascertain its ability to facilitate family time "through audio-visual communication technology and arrange for available virtual family time." *Id.* As described above, the record shows that the caseworker and the family intervention services therapist, at the caseworker's request, attempted to contact the Arapahoe County jail, the Jefferson County jail, and the Arrowhead Correctional Facility but received little response.

¶ 33 Father also argues that the Division did not comply with section 19-3-508(1)(e)(III), C.R.S. 2024, which requires the caseworker to investigate the services and treatment available at the prison or detail the efforts to obtain that information. The record shows that the caseworker attempted to contact individuals at the prison with little success. She met with father at the prison to discuss the services available at the facility and provided a list of available programs and an explanation of the prison case manager's role. And the caseworker documented these efforts in her reports to the juvenile court. Therefore, the Division complied with section 19-3-508(1)(e)(III).

¶ 34    That is not to say that a county department of human services fulfills its reasonable efforts requirement by simply reaching out once to a correctional facility and documenting any response (or non-response) in the caseworker's report.  Indeed, the changes to the statute indicate an intent to promote communication between all of the involved entities to establish various procedures and processes to ensure family time and other services for incarcerated parents.  *See* § 17-42-105(3), C.R.S. 2024 (requiring that the Department of Corrections ensure that children and parents who are incarcerated "have access to opportunities that facilitate continued relationships"); § 19-1-131, C.R.S. 2024 (the state Department of Human Services shall "promulgate rules" to facilitate communication and family time between children and their parents who are incarcerated).

¶ 35    But here, the record shows the caseworker reached out multiple times to more than one facility because father changed locations.  And she requested that the family intervention specialist also communicate with the facilities to arrange family time.  Moreover, while we recognize that once father was reincarcerated, the Division needed to continue providing reasonable efforts,

15

including continued communication efforts with father and case managers or others at the facility where he was housed, the ultimate question is whether the Division made reasonable efforts under the totality of the circumstances.  Here, we are satisfied that the caseworker provided required referrals and services while father was not in custody and adequately attempted to continue those services once father was reincarcerated.

### 3.    Mother's Contentions

¶ 36    Mother contends that the Division did not provide "a readily available support service" and that the Division "failed to perform its duty under the ADA to reasonably accommodate a disability." We are not persuaded that the Division failed to provide reasonable efforts or to make a reasonable accommodation under the ADA.

¶ 37    The record supports the juvenile court's finding that the Division made reasonable efforts to rehabilitate mother.  The Division referred mother for a psychological evaluation and a subsequent neuropsychological evaluation.  As a result of those evaluations, mother was diagnosed with an unspecified major cognitive disorder with behavioral disturbance.  The evaluation recommended "provider support," meaning that the evaluation

16

would be shared with mother's medical providers, therapists, and other professionals. The evaluation also recommended cognitive rehabilitation therapy, occupational therapy, daily supports, individual psychotherapy, medication management, and medical support. The caseworker testified that in response to these recommendations, the Division provided a life skills worker to assist mother with daily supports and filing for Social Security Disability benefits. The Division placed a referral for occupational therapy and a second referral when mother's therapist went on parental leave. With mother's approval, the caseworker shared mother's evaluation with mother's doctor, life skills coach, and individual therapist. The Division also arranged a parent-child interactional study. And the caseworker worked with mother's medical team to schedule tests to try to pinpoint the cause of mother's cognitive decline.

¶ 38    On appeal, mother argues that the Division did not provide required support services to mother in the form of "maternal grandmother." She argues that "[w]orking with maternal grandmother so that she could be a support to Mother and the children was an accommodation that should have been made to

assist Mother in reunifying with the children." But mother does not describe what services the Division should have provided to maternal grandmother. And she does not provide, nor are we aware of, any authority establishing that services for maternal grandmother were required as part of the Division's reasonable efforts obligation under section 19-3-208.

¶ 39 And mother has not preserved any argument that the assistance of maternal grandmother was a reasonable accommodation under the ADA.

¶ 40 It's true that mother filed a "Notice of Americans with Disabilities Act Applicability" alleging that she had a physical or mental impairment that substantially limits a major life activity. However, she did not assert that she required any accommodations, identify such accommodations, or provide any evidence or argument that any accommodations were reasonable. To the contrary, the notice indicated that "[s]hould [mother] require any accommodations or modifications, undersigned counsel w[ould] confer with counsel and motion the Court." Mother points to no subsequent request for accommodations. Accordingly, the juvenile court did not make any findings about mother's disability or

required reasonable accommodations. *See People in Interest of S.K.*, 2019 COA 36, ¶ 21 n.2 (noting that whether a parent is a qualified individual with a disability under the ADA requires a fact-specific determination that a juvenile court must resolve).

¶ 41    Nevertheless, the caseworker testified that the Division incorporated all of the recommendations from mother's neuropsychological evaluation, including talking with mother about moving to an assisted living facility or having daily visits from a home nurse or other person. Mother declined these offers.

¶ 42    On appeal, mother appears to argue that the assistance of maternal grandmother to care for her and the children's needs was required as a reasonable accommodation under the ADA. But she never made this argument to the juvenile court, and therefore we will not address it for the first time on appeal. *See People in Interest of S.Z.S.*, 2022 COA 133, ¶ 18; *see also M.B.*, ¶ 14 ("[A]ppellate courts review only issues presented to and ruled on by the lower court.").

¶ 43    To the extent that mother asserts that the Division was required to provide additional services to maternal grandmother so that she could either take placement of the children or be of

assistance to mother while she cared for the children, we interpret these contentions as support for her argument that the juvenile court erred when it found no available less drastic alternative, which we address next.

### D. Less Drastic Alternative

¶ 44    Both mother and father assert that the juvenile court erred when it found no available less drastic alternative to termination. They both argue that maternal grandmother was available to care for the children either on her own or by moving in with mother to care for them together.  We disagree.

### 1. Applicable Law and Standard of Review

¶ 45    Before terminating parental rights under section 19-3-604(1)(c), the juvenile court must also consider and eliminate less drastic alternatives.  *People in Interest of A.M. v. T.M.*, 2021 CO 14, ¶ 19.  When considering a less drastic alternative, a court must give primary consideration to the child's physical, mental, and emotional conditions and needs.  § 19-3-604(3).  In doing so, the court may consider, among other things, whether an ongoing relationship between the parent and child would be beneficial or detrimental.  *People in Interest of A.R.*, 2012 COA 195M, ¶ 38.

20

¶ 46　　For a less drastic alternative to be viable, it must do more than "adequately" meet a child's needs; rather, it must be in the child's best interests. *A.M.*, ¶ 27. Therefore, if the juvenile court considers a less drastic alternative but finds instead that termination is in the child's best interests, it must reject the less drastic alternative and order termination. *Id.* at ¶ 32. And under those circumstances, we must affirm the court's decision if its findings are supported by the record. *People in Interest of B.H.*, 2021 CO 39, ¶ 80.

### 2. The Juvenile Court Did Not Err in Its Less Drastic Alternatives Finding

¶ 47　　The juvenile court found no available less drastic alternative to termination. The court found the children's therapists persuasive when they opined that "any caregiver in the home would have to be fully able to validate the children's trauma and understand what they need to move forward." Accordingly, the court found that an allocation of parental responsibilities (APR) to maternal grandmother was not a viable option. The record supports the court's findings.

¶ 48　　The caseworker testified that at the time of removal all of the children were malnourished; D.A., who was then ten years old,

21

could not read or write, did not know the letters of the alphabet and could not identify numbers; N.G., who was then four, was nonverbal, not toilet trained, and also could not identify letters or numbers; and L.A., who was then two and a half, could not walk, did not eat any solid foods, and could not hold his bottle on his own. The children's therapists diagnosed each of them with post-traumatic stress disorder. The caseworker testified that all of the children had developmental delays but had made progress since coming into the Division's custody.

¶ 49 The children's therapists testified about the importance of a caregiver who could validate the children's past traumatic experiences. The therapists each expressed concerns about mother's minimization of the severity of the children's symptoms and delays and inability to take responsibility for the trauma and neglect the children had experienced. The caseworker also testified that mother "very much" downplayed and was not able to recognize her part in the neglect the children experienced and that mother was unable to recognize that the children had delays.

¶ 50 The two younger children's therapist testified that if the children's caregiver was not able to validate their experiences, they

were at significantly higher risk for a variety of negative long-term health outcomes related to trauma, physical health, emotional health, and social-emotional well-being. And D.A.'s therapist testified about her concerns that he would regress without a caregiver who could acknowledge his trauma and emotions.

¶ 51 The caseworker also testified that maternal grandmother did not fully understand the children's developmental delays or recognize any concerns when the children visited her immediately before the petition was filed. The caseworker had concerns about the emotional impact of the children living with mother, even with grandmother's assistance, because of mother's inability to acknowledge the abuse and trauma they experienced. And she had concerns that grandmother also did not recognize mother's limitations or the impact those limitations had on the children's development.

¶ 52 The caseworker testified that although the children had a relationship with mother, she was unable to emotionally or physically meet their needs and, accordingly, an ongoing relationship was not in their best interests. Further, the

caseworker opined that placement with maternal grandmother either alone or with mother was not a "viable option."

¶ 53 Both mother and father argue that the court erred when it found no less drastic alternative because the children were not in a permanent home. But the existence of a permanent home is not an element the court must find prior to termination. *See* § 19-3-604. And the fact that the Division was still investigating a permanent home does not in itself make an APR an available or viable alternative. Termination of parental rights freed the children to be adopted once a permanent option was found or approved, and the caseworker testified that the children were adoptable.

¶ 54 Based on this evidence, the juvenile court did not err when it found no less drastic alternative to termination.

### III. Disposition

¶ 55 The judgment is affirmed.

JUDGE WELLING and JUDGE SCHUTZ concur.